480 A.2d 1066

**COMMONWEALTH of Pennsylvania**

v.

**Dale Richard ARNOLD, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 17, 1984.

Filed June 29, 1984.

Petition for Allowance of Appeal Denied Jan. 7, 1985.

statute of frauds. The contract is not invalidated merely because the remedies of the parties are not mutual.

346

Lawrence J. Hracho, Reading, for appellant.

Leonard J. Frawley, Jr., District Attorney, Towanda, for Com., appellee.

Before ROWLEY, HESTER and ROBERTS, JJ.

HESTER, Judge:

Jane Marie Moran, a then recent graduate of the respiratory therapy program at Robert Packer Hospital in Bradford County, Pennsylvania, met Phillip Evans, a security guard at the hospital, at 11:00 p.m. on May 14, 1979. Miss Moran was a resident in the nurse's dormitory located next to the hospital. Mr. Evans was completing his workshift

when he met Miss Moran at the guard's station. The couple had planned a date.

Evans and Moran departed in Evan's automobile and drove to a convenience store in Waverly, Pennsylvania. Following their purchase of a six-pack of beer, the couple proceeded to the "Sheshequin Narrows" in Sheshequin Township, Bradford County. The "Narrows" is that section of Legislative Route 08077 which cuts into a steep hillside on the east side of the Susquehanna River at a point where the Chemung and Susquehanna Rivers merge. At one particular place on the river side of the "Narrows" exists a twelve-foot gravel shoulder. Evans parked his vehicle on this shoulder so that he and Miss Moran could enjoy the view of the rivers two hundred feet below. They drank beer and listened to music as they sat in the automobile.

Sometime after midnight on May 15, 1979, while Evans and Moran remained in the parked vehicle at the "Narrows", the driver's door was abruptly and unexpectedly opened by appellant, Dale Richard Arnold. Appellant pulled Evans from the vehicle, shot him several times with a sawed-off .22 caliber rifle, dragged him across the shoulder of the road and pushed him over the embankment. Evan's body was discovered later that day lying a few feet from the river. An autopsy disclosed gunshot wounds in his neck, right chest wall, left arm, left lower leg, left knee and diaphragm. His neck was also broken at the second cervical vertebra.

Immediately following his disposal of the body, appellant entered Evan's car and drove it a short distance. Moran was lying in the backseat at his direction. Having driven Evan's car for a few moments, appellant stopped and ordered Moran to get out and accompany him. With the sawed-off rifle in hand, he walked with Moran several hundred yards to his two-tone blue, Ford pick-up truck. Both entered the truck, and appellant drove back to Evan's car. As directed, Moran lay across the seat of the truck. Appellant then removed a Pioneer FM radio/cassette tape player from the murder victim's car.

Appellant re-entered the truck and began a nightlong period of driving on isolated roads. He informed Moran that he was seeking the "boss'" house. If the "boss" were found, appellant would release her to him, at which time she would be injected with narcotics and compelled to join his harem.[1] Moran repeatedly expressed her desire to go home.

Following one hour of driving, appellant removed Moran's clothing and compelled her to engage in sexual intercourse in the truck. Thereafter, he drove again, commenting on his inability to find the "boss'" house and the alternative of driving Moran to New York City where she could work as a prostitute. Appellant stopped the truck a second time, again engaging in sexual intercourse against Moran's will.[2]

As daylight approached on May 15, 1979, appellant promised to drive Moran to Robert Packer Hospital, providing she remained quiet about the evening's events and released her name, address and telephone number to him. He informed her that he had "men" on the Sayre police force and threatened to kill her if she reported what had transpired to authorities. Miss Moran provided the requested information and pledged her confidence. Appellant did in fact release her at the hospital at 8:00 a.m. on May 15, 1979.

Moran reported to law enforcement officials later that day; however, appellant was not arrested until August, 1980, fifteen months following the commission of the crimes. The investigation proved lengthy and complicated as a result of Miss Moran's need of psychiatric counseling.

1. Prior to trial in this matter, appellant pled guilty to aggravated assault, kidnapping, robbery and impersonating a public servant for the December, 1978 beating and abduction of Sharon E. Smith. He was sentenced to not less than four nor more than twelve years for these offenses. Prior to beating Smith with a tire iron in an abandoned house, appellant drove aimlessly in his truck with her for an extended period under the pretense of finding the "boss'" house.

2. Sexual offense charges were not filed against appellant due to the fact that it was not known whether the sex acts were committed in Pennsylvania or New York; neither state was certain it had jurisdiction. Jane Moran was unfamiliar with the roads taken by appellant. Furthermore, it was dark, and she was unable to detect landmarks.

The night-long episode left her mentally afflicted, which particularly affected her ability to identify appellant as the assailant.

Appellant was charged with murder of the first, second and third degrees, aggravated assault, terroristic threats, kidnapping, robbery, theft by unlawful taking or disposition, crimes committed with firearms and prohibited offensive weapons.

On March 19, 1981, following a jury trial in Bradford County, appellant was found guilty of first degree murder, theft and kidnapping. Motions for a new trial and arrest of judgment were denied. Life imprisonment, concurrent with unrelated sentences, was imposed. This appeal was taken from the judgment of sentence dated May 26, 1982. We address, in particular, four issues raised by appellant. We acknowledge numerous remaining arguments; however, due to the fact that they are clearly meritless and do not carry the significance of the issues hereafter addressed, we summarily dismiss them.[3]

**3.** Appellant's remaining arguments are as follows:

1) The lower court erred in failing to amend or redact the information or in the alternative in failing to suppress references to the rape of Jane Moran;

2) The lower court erred in failing to allow cross-examination of defense witnesses regarding the similarity of offenses committed by a William Payton with those for which appellant was tried;

3) The lower court erred in finding the Commonwealth's firearm's witness to be a qualified expert;

4) The lower court erred in denying a mistrial despite a Commonwealth reference to a defense ballistics test when the Commonwealth had been notified of appellant's intent not to use the test results as evidence;

5) The lower court erred in denying a mistrial on grounds of an improper cross-examination of appellant's girlfriend, Lulu Felicita;

6) The lower court erred in allowing Lulu Felicita to testify despite allegations that she was an incompetent witness as appellant's common-law wife;

7) The lower court erred in allowing several Commonwealth witnesses to testify as to "state of mind";

8) The lower court erred in allowing the testimony of several Commonwealth witnesses who testified as to appellant's "consciousness of guilt";

Appellant's first assignment of error was the lower court's denial of his request for a change of venue. It is appellant's contention that the empaneling of an impartial jury from Bradford County was barred by the cumulative reporting of three area newspapers, The Daily Review, the Elmira Star Gazette, and The Evening Times. He points out that many articles covering the case were "headline" news, that portions of Jane Moran's pre-trial testimony were published, that his criminal past was reported and that the reports of pre-trial proceedings were exhaustive.

An accused's right to impartial and indifferent jurors is dictated by the constitutional standard of fairness. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Prospective jurors can qualify, however, despite their exposure to media reports on the crime and pretrial proceedings. Whether veniremen enter voir dire with opinions of guilt or innocence is also not reflective of partiality, providing they can dismiss their externally-induced opinions and produce a verdict reflective solely of the evidence presented at trial. *Murphy v. Florida, supra; Irvin v. Dowd, supra.*

Therefore, pre-trial publicity alone does not preclude the empaneling of an objective, impartial jury, nor does it create a presumption of prejudice. *Commonwealth v. Casper,* 481 Pa. 143, 392 A.2d 287 (1978). Moreover, it is the accused's burden to develop a presumption of partiality and to demonstrate actual and unyielding prejudice among jurors. *Commonwealth v. Rolison,* 473 Pa. 261, 374 A.2d 509 (1977), cert. den., 434 U.S. 871, 98 S.Ct. 215, 54 L.Ed.2d 150 (1977); *Commonwealth v. Hoss,* 469 Pa. 195, 364 A.2d 1335 (1976). Appellant neither convinces us of the jury's

9) The lower court erred in allowing a correction officer to testify as to appellant's prison conversation which disclosed prior criminal activity;

10) The lower court erred in allowing the Commonwealth's rebuttal testimony of Janet Parmenter;

11) The lower court erred in denying a mistrial due to the prosecutor's improper closing remarks.

actual prejudice nor raises the presumption of partiality. Accordingly, we perceive no abuse of discretion and defer to the judgment exercised by the lower court in refusing a change of venue. See *Commonwealth v. Scott*, 469 Pa. 258, 365 A.2d 140 (1976); *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976).

The three print media covering these proceedings reported extensively, but responsibly and objectively. The cumulative effect of their publications was not "so pervasive, so inflammatory, and so inculpatory" as to raise a presumption of prejudice. *Commonwealth v. Frazier*, 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977).

The Daily Review, serving Sayre, Athens, South Waverly and Towanda, Pennsylvania, and Waverly, N.Y., reported on the proceedings in approximately thirty editions between May 16, 1979 and February 11, 1981. The Evening Times, circulated among the residents of Sayre, Athens and South Waverly, Pennsylvania, and Waverly, N.Y., used thirty-five publications to report on the proceedings between May 18, 1979 and January 15, 1981. Finally, the Elmira Star Gazette, of Elmira, N.Y., reported on thirty-two separate occasions between May 19, 1979 and January 13, 1981. From May, 1979 through November, 1980, the vast majority of articles on this case was published by these newspapers. Reporting during that period was limited to the discovery of Phillip Evan's body and to the procedural developments in the investigations and court proceedings. At no time prior to November, 1980 did the print media report on the substantive nature of the crime.

During the fifteen-month investigation prior to appellant's arrest, state and municipal officers declined to comment on their progress. This policy was due to the delicate condition of Jane Moran's psyche. Shortly after the crimes, she incorrectly identified a Robert Packer Hospital cafeteria employee as the assailant. This man was arrested and detained in jail for two weeks before Moran withdrew her identification. Thereafter, until August, 1980, Jane Moran received psychotherapy, hypnotherapy and psychodiagnostic

treatment. Her clinical psychologist, Mary Louise Marley, testified that she suffered from acute anxiety which caused her to repress the events and the identification of her assailant. Therefore, law enforcement officials proceeded cautiously and released minimal information to the press in order to protect Miss Moran and to assure a correct second identification. Miss Moran's name was not released to the public until after appellant's arrest.

On August 23, 1980, one day following appellant's arrest, The Daily Review reported:

For almost a year, police have had little to say about the case. A few weeks after the dismissal of charges against Marshall (first man incorrectly accused), there was widespread comment that investigators were back on the trail of 'the original bearded suspect.'

Speaking for the police, Lt. Bloomer expressed concern that revealing information to the public and press as the investigation progressed might be damaging to the case, noting that a policy had been initiated not to comment on the multitude of rumors floating around about the case last May and June.

The Daily Review, August 23, 1980, at 1, col. 6.

Therefore, throughout the fifteen-month investigation prior to appellant's arrest, there was little information available to the newspapers. Although they reported often, they did not report intensively. From May, 1979 to August, 1980, articles repeatedly described the murder scene and the body's wounds and attire, identified the investigating team of officers and reported on the search for the murder weapon, on the composite sketch of the assailant's face and on the arrest and subsequent release of William A. Marshall, the incorrectly-accused man. This type of journalism is not so complete, descriptive or inculpatory as to arouse the prejudice of many readers against appellant. In fact, appellant's name was not reported in connection with this crime until after his arrest on August 22, 1980.

Appellant complains that reports on his criminal history prior to his arrest raised a presumption of partiality. In

June, 1979, the three newspapers reported on charges filed against him for the assault of Sharon Smith and the burglary of two private residences, unrelated incidents occurring in December, 1978. In June, 1979, appellant was not publicly reported as a suspect in this case. As charges were brought fourteen months later, we cannot agree that the earlier arrests were so fresh in the public's mind as to generate a partial outlook on these proceedings.

It is injurious to appellant's position to note that on August 24, 1980 the Elmira Star Gazette published remarks of William M. Gallow, Esquire, the attorney for William A. Marshall. In a conspicuously-arranged article, the newspaper reported on Mr. Gallow's belief that a conviction of appellant would be difficult due to the mistaken identification of his client and the volatile mind of the principal Commonwealth witness, Jane Moran. He remarked on how the tarnished credibility of Miss Moran forced investigating officers to rely less upon their principal witness and more upon circumstantial evidence. Of course, we are unaware whether this particular article actually buttressed appellant's defense; nevertheless, such an article is evidence of objective journalism that could not lead to the empaneling of partial jurors.

■ Following his arrest and until the empaneling of the jury, the newspaper reports covered more completely the actions of appellant; however, these reports were no less objective than those published during the pre-arrest stage. First, a gag order barred the press and public from appellant's preliminary hearing on September 16 and 17, 1980. Prior to the preliminary hearing, the press reported on defense counsel's numerous pre-trial motions, the results of those motions, arguments of counsel, the gag order and other procedural events. Afterwards, the press reports on pre-trial hearings concerning the actual criminal acts were accurate and responsible; we detected no innuendos suggesting appellant's guilt or inflammatory reiteration of the facts. Once again, the reporting following appellant's arrest did not raise a presumption of prejudice.

 The effect of the pre-trial publicity is perhaps shown most accurately upon review of the voir dire testimony of the empaneled jurors. Three jurors read nothing concerning the case. Four other jurors recalled reading articles when reporting began in May, 1979; however, all four protested to know nothing more than that a murder occurred. One juror read one article the day before she appeared for voir dire, and another juror read her first article following the commencement of jury selection proceedings. Two other jurors read a few articles in the Daily Review only. Just one juror followed the case through the Daily Review and believed that he comprehended and retained the substance of the reports. This juror's familiarity with the case did not harm appellant, however. He testified that his reading and discussions convinced him that appellant was innocent. It is most significant to note that every juror, with the exception of one who believed in appellant's innocence, had no opinion of guilt or innocence. All believed that they could limit their deliberations and verdict solely to admissible evidence.

For the foregoing reasons, no presumption of prejudice arose from pre-trial publicity, and appellant was unsuccessful in proving "actual and unyielding prejudice" among the empaneled jurors. Consequently, the lower court properly rejected a motion for change of venue.

Next, appellant contends that it was error to deny his motion to dismiss the charges on the basis of the fifteen-month delay between the crimes and arrest. This delay allegedly weakened his defense due to the death of his alibi witness, Glenn Keene, prior to trial. At the pre-trial hearing on this motion to dismiss, appellant testified that upon completing work at 11:00 p.m. on May 14, 1979, he drove to his Litchfield Township home. He was greeted at 11:30 p.m. by his live-in mate, Mary Louise Beeman, who was also the mother of his two sons. Appellant ate dinner, but did not remain at home. Instead, he drove to Sayre, Pennsylvania, to visit his girlfriend, Lulu Felicita, at her place of employment. Following a brief visit, he began his journey

to home. While traveling on Mt. Pleasant Road, appellant allegedly struck and killed a deer. He stopped, placed the deer on the bed of his pick-up truck and drove to Glenn Keene's house located on Mt. Pleasant Road. Appellant testified that he gave the deer to Mr. Keene and that the two men spent the rest of the evening until sunrise removing the entrails and hide and cutting the meat. Appellant could not recall the date of Mr. Keene's death; however, he believed that his death occurred prior to November, 1979.

Passage of time between crime and arrest is not a matter within the context of Sixth Amendment speedy trial rights. Only a formal indictment, information or arrest, any of which binds an accused to respond to a criminal charge, invokes Sixth Amendment privileges. Once a citizen's liberty is restrained, his speedy trial rights are activated. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

The primary safeguard against undue delay between crime and arrest is the applicable statute of limitations. *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). On occasion, however, the statute of limitations does not provide the necessary protection. This is particularly true with murder charges where there is no limitations period. Our United States Supreme Court commented on those occasions where the statute of limitations has not expired, yet prejudice is inflicted on the accused:

.... it is appropriate to note here that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.

*United States v. Marion*, 404 U.S. at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 480, 481.

■ This Court in *Commonwealth v. McCloud,* 218 Pa. Super. 230, 275 A.2d 841 (1971), reviewed the constitutionality of an eight-month delay between the defendant's use and sale of narcotics and his arrest. The *McCloud* court studied several decisions of our United States Supreme Court and Circuit Courts of Appeal and gleaned therefrom that identification testimony and the effect of the pre-arrest delay on the identification are dispositive factors in determining whether the delay impinged upon the accused's due process rights. Consequently, the *McCloud* court extracted and adopted a two-part analysis of the effect of pre-arrest delay. First, "a proper balance must be struck between defendant's right to identification testimony of probative value and the public's right to effective police detection..." *Id.,* 218 Pa.Superior Ct. at 235, 275 A.2d at 844. Secondly, "the reasonableness of the delay necessitated by the conduct of an effective investigation" must be weighed against any prejudice suffered by the defendant. *Id.,* 218 Pa.Superior Ct. at 236, 275 A.2d at 844.

The *McCloud* test was utilized in *Commonwealth v. Barnes,* 237 Pa.Super. 407, 352 A.2d 107 (1975), where this Court considered the propriety of a six-month delay between the crime and arrest. First, the *Barnes* court noted the definite identification of the defendant by the narcotics' agent. The identification was uncorroborated, but it was unwavering and independent of the agent's records. Secondly, the informant's unavailability for trial was not so prejudicial to the defendant as to outweigh the Commonwealth's interest in the delay. It was noted that the absent informant could affect credibility only of other witnesses; the defendant agreed that the informant's testimony would offer no fresh evidence. Accordingly, the *Barnes* court held that the delay did not adversely affect the defendant's due process rights.

A result more akin to the instant matter was reached in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), reh. den., 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977). There, the offenses of possessing fire-

arms stolen from the United States mails and dealing in firearms without a license occurred eighteen months prior to indictment. The defendant complained that two defense witnesses, who could support his position that several firearms were purchased from individuals without connection with the postal service, died during the eighteen-month interim. The *Lovasco* court conceded that the death of two witnesses may have weakened the defendant's case; nevertheless, the reasons for the delay outweighed any prejudice sustained.

■■■ *Lovasco* made it clear that prosecutors are not obligated to arrest and file charges at the moment probable cause exists and prior to their belief that there is sufficient evidence to prove the suspect's guilt beyond a reasonable doubt. In noting the advantages of purposeful delay for the prosecution, suspect and judiciary, the *Lovasco* court commented:

> In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused,' *United States v. Marion*, 404 U.S. at 324, 92 S.Ct. at 465, precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of 'fair play and decency', a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed,' *Smith v. United States*, 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041 (1959). This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, *even if his defense might have been somewhat prejudiced by the lapse of time.* (Emphasis added). 431 U.S. at 795, 796, 97 S.Ct. at 2051, 2052, 52 L.Ed.2d at 762, 763.

██ Here, the following evidence was accumulated within two months of the crime: Jane Moran's composite of the assailant, the murder weapon, Phillip Evan's automobile, Phillip Evan's empty plastic wallet inserts, Phillip Evan's FM radio/cassette tape player, and Jane Moran's identification of a red and white ice chest and blue flag from appellant's truck. The accumulation of this evidence made appellant a suspect, but it was not enough to overcome the apprehension of investigating officers. This apprehension was primarily due to Jane Moran's emotional affliction. She retracted her identification of William Marshall as the assailant two weeks following his arrest. This prompted the dismissal of charges. It also dictated the investigators' strategy of giving Miss Moran ample time to recover so that her next identification would be positive and correct.

Jane Moran made no progress through December, 1979 despite psychiatric care. Her attempts to identify appellant from photographic arrays failed on at least two occasions. Chief investigating officer Lt. Edward Bloomer called Miss Moran and her mother monthly to check her progress. His conversations with them and Dr. Marley left him with the impression that Moran involuntarily refused to identify appellant for fear of reprisal.

Miss Moran sustained another blow to her frail mental condition in 1980 when her fiancé died of an epileptic seizure. Although she responded adequately to professional treatment in 1980 to enable her to testify at pre-trial hearings and trial, she never issued a positive identification of appellant.

Lt. Edward Bloomer of the Pennsylvania State Police explained why appellant's arrest was delayed:

I felt then and I feel now that Jane Moran as our witness, as a witness in this case, she identified the wrong person at one time and since then she was under mental stress and strain. We were waiting for her to give her an opportunity not only mentally but physically to be able to correctly identify the person responsible. The reason for

the delay was strictly giving her an opportunity to be able to be treated, . . . .

(N.T., December 18, 1980, p. 90).

The decision to finally arrest appellant was based upon the investigating team's consensus that Jane Moran might never positively identify appellant and that arrest and prosecution should proceed with the accumulated evidence alone.

It is apparent that the prosecution was not utilizing the fifteen-month hiatus between crime and arrest to prejudice appellant and gain a tactical advantage. The embarrassment of the misidentification forced them to strike a balance between an intense investigation and a gentle handling of Jane Moran. This approach was not only an attempt to assure the propriety of prosecution, but to justify the expense of criminal proceedings and to have the actual murderer answer the charges. We do not lightly dismiss the loss of his alleged alibi witness, but we remind appellant that the delay also served his interests as officials exhausted all means to assure arrest of the correct man. Furthermore, inasmuch as Glenn Keene was a corroborative witness only, his death did not preclude new and exonerating evidence. Therefore, we conclude that the delay was justified and any prejudice incurred by appellant did not outweigh the benefits of an assiduous investigation.

It is also appellant's contention that the lower court erred in refusing to suppress pieces of white plastic tubing, a plastic wallet insert and pieces of yellowish-cream foam rubber seized from appellant's Litchfield Township home on June 5, 1979. According to appellant, the search warrant was invalid as a result of the absence of probable cause, and officers improperly relied upon the consent of appellant's father to search the home.

On June 1, 1979, two weeks following the murder of Phillip Evans and abduction of Jane Moran, appellant was arrested at his house for his offenses committed against Sharon Smith in December, 1978. He was incarcerated pending trial. His house was located on Legislative Route 08084 in Litchfield Township; his father, Wallace Arnold,

resided across the roadway, approximately two hundred yards away.

On June 5, 1979, Lt. Bloomer and Troopers Renninger and Van Vliet of the Pennsylvania State Police drove to Wallace Arnold's home with a search warrant in the Sharon Smith case authorizing a search of appellant's home. At that time, appellant was only a suspect in this matter. Records showed that legal title to appellant's real estate was registered jointly in the names of Wallace Arnold and his wife. Trooper Renninger testified that when the search warrant was served upon him, Wallace Arnold pledged his cooperation and insisted that the "paperwork" was not necessary. Thereafter, Mr. Arnold walked with the officers to appellant's house, may have assisted with unlocking the door and accompanied them to the inside. He remained inside while the officers executed the Sharon Smith search warrant, which authorized the search and seizure of, inter alia, lipstick, cosmetics, Christmas ornaments, wallet, purse and pieces of black fur.

As Trooper Renninger was searching in the basement for those items enumerated on the Sharon Smith warrant, he discovered plastic tubing and foam rubber similar to that attached to the barrel of the murder weapon recovered two days earlier. The plastic and foam rubber served as a crudely-hewn silencer. Renninger also discovered .22 caliber shell casings matching those found at the gravel berm above Phillip Evan's body. Shortly thereafter, Trooper Perechinsky arrived, and both he and Renninger departed to apply for a search warrant in this matter to authorize seizure of the newly-discovered items in the basement and other items pertinent to this matter but not in plain view. Wallace Arnold and the other officers remained at appellant's house while Perechinsky and Renninger presented their application for a search warrant to an available magistrate.

This second search warrant (No. A24063) was also read to Wallace Arnold upon the two officers' return to the search scene. Again, he did not object. Pursuant to the execution

of this warrant, the officers seized plastic tubing, six pieces of foam rubber, black work shoes and an assortment of .22 caliber shell casings from the basement. An empty plastic wallet insert, bearing an ink impression of Phillip Evan's name, was removed from appellant's bedroom. This warrant authorized the seizure of a blue flag on a metal stem, work shirt, blue jeans, brown work shoes, .22 caliber ammunition and casings, foam rubber, plastic tubing and a man's belt and wallet.

Appellant specifically argues that this second search warrant was invalid inasmuch as the passage of three weeks from the crimes to the issuance of the warrant rendered stale the information in the search warrant affidavit. According to appellant, the criminal activity must continue up to the time of the issuance of the warrant. Secondly, he maintains that his father was without authority to consent to the search in lieu of a valid search warrant. Appellant contends that his incarceration while he awaited prosecution in the Sharon Smith case was not evidence that he abandoned his house. Nor was there adequate evidence of Wallace Arnold's joint control of the house, giving him authority to consent to the search.

■ We do not agree that the search warrant was defective because of staleness. An issuing authority must employ a fact and circumstances test in determining whether the passage of time between a criminal occurrence and the issuance of a search warrant makes it unreasonable to find probable cause that certain evidence remains on the premises to be searched. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932); *Commonwealth v. Jackson*, 227 Pa.Super. 1, 323 A.2d 799 (1974).

■ Investigating officers were aware since May 15, 1979 that .22 caliber shell casings, the blue flag, Phillip Evan's wallet and belt, and the assailant's work shirt, blue jeans and work boots were potential physical evidence. After all, the shell casings were found at the murder scene,

the murder victim's wallet and belt were missing and Jane Moran described the clothing worn by her abductor. Furthermore, the delay was not the result of sloth. As alluded to earlier, investigating officers proceeded cautiously and deliberately since William A. Marshall's release. Jane Moran's malady was such that she could not generate prosecutorial confidence in her as the principal Commonwealth witness. The risk of searching the home of an innocent person was more acute than the risk of allowing delay to result in "staleness."

Next, the discovery of the foam rubber, shell casings and PCV tubing in plain view during the execution of the Sharon Smith search warrant did much to revitalize the information upon which probable cause was based. These items of physical evidence were linked to the murder weapon recovered on June 3, 1979. They were also related to the assailant's attire and personal effects missing from Evan's body.

Moreover, it is unfair to evaluate probable cause by a three-week delay to the extent it authorized search and seizure of the foam rubber and PCV tubing. The murder weapon, with its barrel covered with this material, was recovered only two days prior to the issuance of this warrant. The purpose of the foam rubber and tubing was not known until the weapon was seized. Certainly a two-day delay, with only a hunch that appellant was the murderer, would not cause stale information.

■■■ Also, the foam rubber, plastic tubing and shell casings were in "plain view" on the basement floor. Equipped with a valid, enforceable search warrant for the Sharon Smith case, the officers were rightfully inside appellant's home. Therefore, objects within their plain view were subject to seizure and admissible as evidence. *Harris v. United*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *Commonwealth v. Martin*, 252 Pa.Super. 265, 381 A.2d 491 (1977). A search warrant, then, was a superfluous mechanism for the seizure of those three items.

Appellant further complains that the search and seizure of his 1974 Ford pick-up truck and certain items therein was unlawful. On June 4, 1979, investigating officers in the Sharon Smith case applied for and received a search warrant for appellant's truck. The search warrant was presented to appellant's father, Wallace Arnold. Shortly thereafter, the truck was towed to the Towanda barracks of the Pennsylvania State Police. On June 5, 1979, officers prepared a written consent for further search of the truck with regard to general criminal investigation not limited to the Sharon Smith case. Wallace Arnold signed the consent enabling officers to search the vehicle on June 7, 1979 and to recover dog hair and pieces of paper.

As we are of the opinion that Wallace Arnold exercised common control with appellant over the 1974 truck, his consent to the seizure of the truck and to the search and seizure of items therein was binding. Our United States Supreme Court explained the effect of a consenting third party:

.... when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249, 250 (1974).

Third party consent may also be explained in terms of one party having a diminished expectation of access to and use of premises shared with another. Therefore, a person exercising "common authority" over property may bind the absent, non-assenting person to the ramifications of a consensual search and seizure. *Commonwealth v. Van Jordan*, 310 Pa.Super. 516, 456 A.2d 1055 (1983).

There is sufficient evidence of Wallace Arnold's joint access and control over the 1974 Ford pick-up truck. Wallace Arnold purchased the truck in October, 1978 primarily for appellant's benefit. Although appellant paid the

monthly installments and insurance, title was registered in Wallace Arnold's name. Wallace Arnold admitted to driving the truck on occasion. Following appellant's incarceration on June 1, 1979 for the Sharon Smith charges, Wallace Arnold transferred the truck to his driveway. With title registered in his name, he considered it his "responsibility" to prepare the vehicle for inspection. His plans to sell the truck were made without consultation with appellant. These facts demonstrate that appellant was bound by his father's consent to the search.

For identical reasons, appellant's argument that the June 13, 1979 search and seizure of pliers and an eight-foot, ten-inch plastic pipe from his house and yard was invalid, must also fall. Wallace Arnold and his wife were record owners of appellant's house, and they had access thereto as evidenced by Mr. Arnold's assisting investigating officers to enter. Further evidence of Wallace Arnold's common authority was his removing Mary Beeman and her two children from appellant's house to his house, making appellant's house available to appellant's sister while he remained incarcerated.

Appellant also argues that the lower court erred in not suppressing the .22 caliber rifle and cardboard box. He objects to the intrusion by a Bradford County correction officer into his private conversation with Albert Raymond in the visitor's area of the Bradford County Jail. This intrusion alerted investigating officers to the whereabouts of the murder weapon.

On June 3, 1979, Phil Shamoun, a correction officer at the Bradford County Jail, was doing paper work at a desk located twenty feet from the visitor's area. Mr. Shamoun testified that he overheard appellant instruct his visitor, Albert Raymond, to bury the .22 caliber sawed-off rifle. Shamoun was familiar with appellant's voice, and he knew that Raymond was appellant's visitor. Shamoun contacted the Pennsylvania State Police barracks at Towanda a few minutes after overhearing the conversation. A cardboard box housing the weapon was retrieved by Troopers Pere-

chinsky, Petti and Lt. Bloomer from Raymond's garage later that day. Raymond informed the officers that he loaned the rifle to him in April, 1979, and that he learned from appellant on June 3, 1979 that Lulu Felicita, appellant's girlfriend, had possession of the weapon. Raymond recovered it from Felicita later that day, prior to releasing it to the officers.

Appellant introduced evidence that Mr. Shamoun was not scheduled to work on June 3, 1979, and that there was no time card to reflect his working that day. Phil Shamoun admitted that Trooper John George instructed him to remain attentive to any conversation engaged in by appellant. Appellant deduces from this information that Shamoun was within the jail on June 3, 1979 for the purpose of eavesdropping, not to report for regular assignment.

The issue presented here is whether appellant's Sixth Amendment right to assistance of counsel and Fourth Amendment protections against unreasonable search and seizure were violated by the admission into evidence of the murder weapon and of appellant's incriminating conversation with Albert Raymond at the jail.

Since *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), unreasonable search and seizure is not restricted to actual physical penetration of a person's curtilage. Eavesdropping may rise to the level of physical intrusion, although it need not be equated with property law trespass. In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the defendant was detained in a Norfolk, Virginia jail pending a charge of armed robbery. An inmate of the jail became a confidential informant for the Federal Bureau of Investigation. He was directed to remain alert to statements of the defendant, but not to initiate a conversation with him concerning the pending charge. When the informant was released from jail, he informed an F.B.I. agent of the defendant's admission to the armed robbery.

In holding the informant's activities to be an infringement upon the defendant's right to counsel, the *Henry* court noted the informant's paid assignment, the informant's cover as a fellow-inmate of the defendant and the defendant's incarceration under indictment at the time of the incriminating statement. Particularly irksome to the *Henry* court was the informant's impetus to produce useful information due to his assignment on a contingent-fee basis. Therefore, the court was unimpressed with an F.B.I. agent's instructions to the informant not to actively seek conversation with the defendant concerning the robbery. The court also noted the likelihood that an accused would speak more freely without counsel to a confrere, doubling as an informant, than to a known law enforcement officer. Finally, the defendant's incarceration was viewed as a mechanism to promote free conversation and association with an inmate ostensibly sharing a similarly undesirous confinement.

Appellant would have us subscribe to the *Henry* analysis and grant a new trial. We do not think *Henry* to be controlling. Instead, we find this matter more closely resembling the issues addressed in *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), reh. den., 386 U.S. 940, 951, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967). While Teamster's President James Hoffa occupied a suite in a Nashville hotel during his trial on charges of violating the Taft-Hartley Act, a Teamster Union official from Louisiana frequently visited him. This official superficially sought Hoffa's advice on local union problems, when in fact he was surreptitiously gathering information for federal agents regarding Hoffa's attempts to tamper with the jury. Based upon several incriminating statements made by Hoffa to the union official, Hoffa was convicted of attempting to bribe members of the jury.

The *Hoffa* court first rejected the Fourth Amendment challenge. The court conceded that the informant was working for the government from the moment he arrived in Nashville. It also recognized that Fourth Amendment protections extend beyond the home and tangible evidence to

hotel rooms and oral statements. What the court found dispositive, however, was the absence of a legitimate Fourth Amendment protection.

Hoffa was not relying upon the sanctity of his hotel room when he incriminated himself. The informant was Hoffa's guest, and every word was directed to him or uttered in his presence. The incriminating statement, therefore, was the result of Hoffa's misplaced confidence in the informant. The Sixth Amendment challenge was rejected due to the fact that incriminating statements regarding bribery of jurors were unrelated to the pending charges of Taft-Hartley violations.

■ Here, appellant's instructions to Raymond to bury the weapon were not issued in direct conversation with an informant. They were issued freely with the purpose of concealing evidence of a crime for which he was not yet charged. As in *Hoffa*, appellant did not expect Fourth Amendment protections when he spoke with Raymond in the visitors' area. Testimony demonstrated that a partition with a small perforated section for speaking separated visitors and inmates. Due to the noise from the general population in the cell block, the inmate often spoke loudly to his visitor. He did not occupy a separate room; instead, he stood before the visitors' partition at one end of the cell block. Just as Hoffa had misplaced his trust in the union official, appellant misplaced his trust in the visitors' area of the cell block.

■ Although we must recognize that Shamoun was instructed to remain alert and that he overheard appellant's incriminating statements on a non-scheduled workday, there was testimony that Shamoun was present for the purpose of instructing a new employee on the operating procedures of the visitors' area. He did not engage in conversation with appellant in an attempt to elicit useful prosecution material.

■ In addition to having no expectation of Fourth Amendment privileges in the visitors' area, appellant has no

justifiable complaint that his Sixth Amendment right to counsel was violated. As in *Hoffa,* he was not yet charged with the Evans/Moran crimes. His attorneys in the Sharon Smith case were not present, and the incriminating statements were wholly unrelated to that pending proceeding. Without Fourth and Sixth Amendment expectations at the time Phil Shamoun overheard appellant's incriminating statements, the murder weapon was properly admissible.

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.