526 A.2d 749

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Willie SNEED, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 1, 1986.

Decided May 22, 1987.

598

Charles P. Mirarchi, III, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Unit, Alan Sacks, Philadelphia,

Marion E. MacIntyre, Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

A jury convicted the appellant, Willie Sneed, of murder in the first degree [1] and possession of an instrument of crime [2] for the shooting death of Calvin Hawkins. A sentencing hearing was then conducted in accordance with Section 9711 of the Sentencing Code.[3] After further deliberation, the jury determined the appellant be sentenced to death. Post-verdict motions were denied and the appellant was formally sentenced to death, plus a concurrent term of two and one-half to five years imprisonment for the weapons offense.

The appellant pursued a direct appeal to this Court from the judgment of sentence. 42 Pa.C.S. §§ 722(4); 9711(h)(1). He raises several issues which we will address after first examining the sufficiency of the evidence.

## I. SUFFICIENCY OF THE EVIDENCE

■ The appellant does not directly challenge the sufficiency of the evidence supporting his murder conviction. Nevertheless, it is the practice of this Court in death penalty cases to review the sufficiency of the evidence regardless of whether the appellant contests the issue. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26–27, n. 3, 454 A.2d 937, 942, n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard to be applied in reviewing the sufficiency of the evidence is

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 907.
3. Act of September 13, 1978, P.L. 756, No. 141, § 1, *imd. effective;* 42 Pa.C.S. § 9711.

whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976). The evidence presented at trial, together with all reasonable inferences in favor of the Commonwealth, discloses the following.

On October 13, 1980, appellant went to a "shooting gallery" in Philadelphia to obtain and "shoot" drugs. Before the night passed, there was to be a shooting of more than drugs. At the "gallery" there were no drugs at hand. "Boobie" Liverman, a friend of the appellant, told him where drugs were available. "Signman" Henderson overheard and offered to take appellant to the pusher. Appellant and Henderson went to the pusher's house, but he was not at home. Sitting on the front steps of the pusher's house was a stranger, who when told they were in the market for cocaine, offered some. The drugs were, however, a distance away, and the stranger offered a ride in a parked, white Lincoln Continental; the type of a luxury car whose shining chrome so often reflects the grim graffittied streets and haunted faces of its victims.

In the car were two other strangers to appellant and his friend Henderson. They all got in and drove to another section of the city.[4] They stopped at a bar and appellant's friend Henderson got out of the car and waited while appellant and the other strangers went for the drugs. They never returned for Henderson, and he took a cab home. After awhile appellant came to Henderson's house and told Henderson, who would later tell the jury, that he had been swindled by the three strangers who sold him aspirin for cocaine and would not return his money. The three strangers who would not return his money drove appellant back to

---

**4.** The three strangers were Calvin Hawkins, Matthew Barbara, and David Gratham. The record is unclear as to which of these three, if any, was a principal in this drug transaction. The appellant stands convicted of Hawkins' homicide. Barbara and Gratham likewise came to untimely ends sometime after this incident, but the appellant is not implicated in their deaths. Of the Lincoln Continental we know no more.

the "gallery". When they did appellant snatched the keys from the Lincoln, ran into the gallery, and got his gun. Rather than return his money the three men, abandoning the car, ran. Appellant chased one Calvin Hawkins, and shot him three (3) times. Hawkins took cover behind a parked car. Then, as appellant told Henderson, and Henderson told the jury,

> I [Appellant] jumped on top of the car and the guy looked up at me [Appellant] and said, "Damn, you shot me twice; ain't that enough?"

> I [Appellant] shot him ... in the head point blank and his head hit the ground.

N.T. 3/12/85, 24.[5]

After furnishing his account of the shooting, the appellant spent the rest of the night at Henderson's home. Henderson buried Sneed's weapon in his backyard for safekeeping.[6] The appellant left in the morning after Henderson returned his revolver.

We are satisfied that the evidence is sufficient to sustain the jury's verdict of guilt on the charge of murder in the first degree.

## II. UNDUE DELAY BETWEEN THE DATE THE CRIME OCCURRED AND THE DATE OF ARREST.

Calvin Hawkins was killed in the early morning hours of October 14, 1980. An arrest warrant for the appellant was not obtained until January 13, 1984. The appellant asserts this delay in excess of three years denied him due process

---

5. Hawkins was shot a total of four times by a .32 caliber weapon: once in the left arm; once in the right shoulder; once in the back; and once in the head. Therefore, he was mistaken when he told Sneed he had been shot twice. Sneed himself corrected Hawkins' error in his tale to Henderson by emphasizing that he shot Hawkins three times before the shot to the head. Certainly, under the circumstances, Mr. Hawkins can be excused if his count was off the mark.

6. Henderson identified the weapon as a .32 caliber revolver containing four spent rounds and two live ones. He threw the four empty cartridge cases onto his roof, but left the two live cartridges with the gun. The appellant apparently disposed of this weapon sometime after Henderson returned it.

of law in that he was prevented from eliciting the testimony of Matthew Barbara and David Gratham [7] as to the identity of the actual killer.

When a defendant argues undue delay in the filing of charges, proof of prejudice is a prerequisite to consideration of whether there has been a denial of due process. *Commonwealth v. Colson*, 507 Pa. 440, 452, 490 A.2d 811, 817 (1985), *cert. denied*, — U.S. —, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). The appellant has failed to cross this threshold since he has not shown that the testimony of Barbara and Gratham would have tended to exculpate him.

Even were a defendant to show prejudice due to a delay in his arrest, the adverse effect on his defense is excusable if the delay was a derivation of reasonable investigation by the authorities. *See United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

In the instant case, the police did not accumulate sufficient information to arrest the appellant for Hawkins' murder until late 1983; nor had they known where Sneed was. In fact the appellant returned to his native state of Georgia shortly after Hawkins was murdered. Sneed ran afoul of the law there, and was ultimately ensnared for this crime due to information his cellmates provided to Georgia penitentiary authorities concerning the murder in Pennsylvania. Georgia authorities contacted the Philadelphia police who in turn rejuvenated their investigation. Once armed with this fresh lead, the police and district attorney's office were able to persuade those present at the shooting to testify at Sneed's trial. Therefore, the delay in this instance in fact was caused by the defendant, rather than being voluntary on the part of the law enforcement authorities. Consequently, the appellant's argument based upon undue delay in acquiring an arrest warrant would fail even had he proven prejudice.

7. As previously mentioned, Barbara and Gratham died between the time of the crime and appellant's arrest. See note 4, *supra.*

The appellant's assertion of prejudice arising from the delay in his arrest is meritless.

## III. ASSERTIONS OF ERROR RELATED TO THE GUILT PHASE OF THE APPELLANT'S TRIAL.

The appellant propounds several errors during the guilt phase of his trial which he asserts as bases for this Court to grant him a new trial.

### A. THE DEATH QUALIFICATION OF JURORS.

■ The trial court sustained the Commonwealth's challenge for cause of three prospective jurors based upon their assertions that they could not impose the death penalty in a legally proper case. The appellant argues this ruling was an error which deprived him of a fair and impartial jury from a representative cross section of the community, because death qualified juries are conviction prone.

The United States Supreme Court has addressed and rejected this argument as a matter of federal constitutional law. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). This Court, as a matter of state constitutional law, has shown no inclination to extend greater protection to an accused in this context than is required by the federal Constitution. *Commonwealth v. Peterkin*, 511 Pa. 299, 320, 513 A.2d 373, 384 (1986), *cert. denied*, — U.S. —, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). Appellant presents no argument which persuades us to alter this course and, therefore, we reject his contention.

### B. THE OVERRULING OF DEFENSE COUNSEL'S OBJECTIONS TO THE TESTIMONY OF COMMONWEALTH WITNESSES.

■ The Commonwealth called to the stand a witness accepted as an expert in the field of fingerprint identification. During direct examination of the witness defense counsel interjected an objection which the trial court overruled.[8] The appellant contends that the trial court erred in

---

8. The objection arose from the following testimony.

its ruling because of the form of the question and the response it elicited. Specifically, the appellant asserts that the prosecutor's question ·was leading and the witness' answer was inadmissible hearsay because he was testifying on the basis of another technician's report.

However, in this instance it is unnecessary for this Court to resort to the law of evidence beyond designating the purported error harmless.[9] In fact, it may have actually been beneficial to the appellant. The overall thrust of this expert's testimony was that Willie Sneed's fingerprints were *not* found on the White Lincoln. The prosecutor was frustrated in his repeated attempts to prove a negative through this witness, to wit: merely because Sneed's prints were not found on the car does not mean he could not have been in it. Defense counsel successfully objected to this line of questioning. Consequently, this expert's testimony better served the appellant than the Commonwealth.

Defense counsel also made a hearsay objection to a police officer's testimony concerning the content of the radio call which prompted his trip to the scene of the crime. N.T. 3/11/85, 43. · This objection was erroneously overruled, argues the appellant.

An out of court statement which is not offered for its truth, but to explain the witness' course of conduct is not hearsay. *Commonwealth v. Cruz*, 489 Pa. 559, 565, 414 A.2d 1032, 1035 (1980). This particular testimony was merely offered to show how the officer came to be at the

Q. [BY THE PROSECUTOR]: Where did the seven or the three identifiable lifts and the one questioned one come from?
A. A 1975 white two door Lincoln, Ohio license plate, 7708BS. And it is from the left exterior side rear view mirror.
Q. That would be the driver exterior rear view mirror?
A. I would assume so, sir. I am going by somebody else's notes here.
[DEFENSE COUNSEL]: I would object Your Honor.
THE COURT: I will overrule your objection.
N.T. 3/11/85, 35.

9. As to the leading quality of the question, we daresay the characterization of "the left exterior side rear view mirror" on a Lincoln Continental as "the driver exterior rear view mirror" is a matter for judicial notice rather than an objection.

crime scene on that night. This Court has specifically held this type of testimony to be admissible for such a purpose. *Id.*

## C. THE PROSECUTOR'S REFERENCE TO A POLYGRAPH EXAMINATION TAKEN BY A COMMONWEALTH WITNESS.

■ During redirect examination of Commonwealth witness Charles "Black Charlie" Russell the following exchange occurred:

Q. [BY THE PROSECUTOR]: You didn't flunk a polygraph test after you gave them that statement, did you, sir?

A. No.

[DEFENSE COUNSEL]: I object.

THE COURT: I am going to overrule it, but please, sir, you are getting out of the purposes of this examination. I don't want that again, sir.

N.T. 3/11/85, 103. The appellant demands a new trial based on the argument that this reference to a polygraph examination improperly bolstered the witness' credibility and reflected the prosecutor's personal opinion that Russell was credible and truthful. *See Commonwealth v. Johnson*, 441 Pa. 237, 272 A.2d 467 (1971).

The appellant's position is untenable considering the circumstances which gave rise to the disputed testimony.

Russell gave the police four separate statements concerning the events at the shooting gallery on the night of October 13, 1980. The first three of these statements were inconsistent with the testimony he ultimately gave at trial under direct examination. Russell submitted to and failed a polygraph examination given in conjunction with the story he told in these statements. However, he did not take a polygraph examination after his final statement to the police dated February 7, 1984. The defense counsel used this inconsistency among the statements to impeach the witness on cross-examination *before* the complained of testimony.

Q. [BY DEFENSE COUNSEL]: I am going to show you a copy of the statement you gave to the police less than two hours, sir, after this incident happened.

Do you want to look at that?

A. No, I don't want to look at it.

Q. Is that your signature at the bottom?

A. Yes.

Q. Is that your signature at the bottom of the second page?

A. Yes.

Q. Is that your signature at the bottom of the third page?

A. Yes.

Q. Now, you just testified that you told the police that night that the defendant, Khaki, and Boobie, plus other people that you named were in there that night; is that right?

A. Right.

Q. The question in the first page of that, "Who else was present in the garage? Answer: Natalie Dickinson, my girlfriend, Points, Dewitt Poindexter, and David Paris."

Do you remember saying that?

A. Yes.

Q. There is no mention in here about Boobie; there is no mention in here—

A. That's why I failed the polygraph test.

Q. Oh, that's why you failed the polygraph test?

A. Yes.

Q. In other words, you went out there and lied?

A. Yes.

.    .    .    .    .

Q. When did you stop lying to the police?

A. I will say when I gave my statement.

Q. You told me every statement you gave you lied?

[PROSECUTOR]: Objection, Judge. That is not what he said at all.

THE COURT: Sustained, sir.

[DEFENSE COUNSEL]:

Q. Which statement—

THE COURT: Then ask him the question.

A. The last statement I gave.

THE COURT: Just a moment. If you wish to direct his attention to a statement sir, ask him about the statement, and then if you desire, you can either ask him to read it or you can read it, if you so desire it. That's up to you.

[DEFENSE COUNSEL]:

Q. Do you know Boobie's real name?

A. No, I don't.

THE COURT: Are you withdrawing the other line of questioning, sir?

[DEFENSE COUNSEL]: May I have a moment, Your Honor?

THE COURT: Sir, answer my question, and then you may take as much time as you need.

Are you withdrawing the other line of questioning?

[DEFENSE COUNSEL]: Okay.

Q. When was the last time you lied to the police?

[PROSECUTOR]: Objection.

THE COURT: Sustained, as to the form of the question.

[DEFENSE COUNSEL]

Q. You said you lied to the police on at least three different occasions; is that right?

A. Yes.

Q. Okay, now—

THE COURT: Ask him with respect to those statements, if you desire, sir.

[DEFENSE COUNSEL]

Q. With respect to the first statement, did you lie?

A. Yes.

Q. With respect to the second statement, did you lie?

A. Yes.

Q. With respect to the third statement, did you lie?

A. Yes.

Q. When did you start telling the truth?

A.  I can't remember the exact date.

N.T. 3/11/85, 88–89;  96–98.

Thus, defense counsel elicited the fact that Russell had taken a polygraph examination and effectively exploited that information to impeach the Commonwealth's witness. However, defense counsel had muddied the water insofar as how many statements Russell had given and which of them were admitted as being untrue.  The challenge for the assistant district attorney on redirect examination was not to bolster the witness, but to rehabilitate him.  Crucial to that effort was the temporal relationship of the failed polygraph examination to the witness' final statement to the police.  The very fact that the prosecutor referred to a test that Russell failed negates any claim of bolstering and lends support to the Commonwealth's argument that this question on redirect examination served only to clarify the sequence of untruthful and truthful statements mentioned during cross-examination.  Therefore, the complained of reference is not within the prohibition of *Commonwealth v. Johnson, supra.*

D.  THE SUSTAINING OF COMMONWEALTH OBJEC-
TIONS TO QUESTIONS POSED BY THE DEFENSE
COUNSEL ON CROSS–EXAMINATION.

■ During cross-examination of Commonwealth witness Zeb Liverman, the prosecutor successfully objected to a particular question.

[DEFENSE COUNSEL]:

Q.  On direct examination, you said you looked to your left and saw somebody, two guys ran past you and then you ran that way towards South Street, right?

A.  Yes.

Q.  You didn't mention anything about a commotion or an argument, four guys around the car and doors opening.  You didn't mention any of that, did you?

[THE PROSECUTOR]: If that is a question, Judge, I object to it.

THE COURT: Sustained, it is not a question. It is a statement. You may rephrase it, and make it a question, sir.

N.T. 3/11/85, 172.

The appellant argues that this objection was erroneously sustained and, consequently, his trial counsel was handicapped in his effort to impeach Liverman. This position ignores the reality of what actually transpired because the defense counsel was permitted to pursue this line of questioning immediately.

[DEFENSE COUNSEL]:

Q. On direct examination, did you mention an argument?

A. No, I didn't.

Q. Did you mention a commotion?

A. No, I didn't.

Q. Did you mention any hollering or screaming?

A. I mentioned the commotion.

Q. Did you mention four people around the car?

A. No, I did not.

N.T. 3/11/85, 172.

The appellant also points to the trial court's ruling favoring an objection during the cross-examination of Henderson as another basis upon which to grant him a new trial. The defense counsel was emphasizing the point that Henderson's cooperation in testifying was partly the result of the assistant district attorney's offer to assist in getting the witness' bail reduced on a charge unrelated to the case at bar. However, it is apparent from the record that the defense counsel was engaging in histrionics by arguing with the truth of Henderson's previous answer rather than merely posing a question.

[DEFENSE COUNSEL]:

Q. In fact, the first three years you completely forgot about this whole incident; is that what you testified to?

A. That's right.

Q. You are really hoping that your bail gets lowered, aren't you?

[THE PROSECUTOR]: Judge, I object to that.

THE COURT: Sustained.

N.T. 3/12/85, 64.

The fact relative to the witness' bail the defense counsel referred to was one with which the jury was familiar. The prosecutor had made clear during direct examination that he and the witness had reached an understanding concerning Henderson's bail. The use to which the defense counsel put this information was to express his personal disapproval of the witness' prior responses during the course of cross-examination, rather than to legitimately interrogate the witness.

Neither of these rulings by the trial court, nor those previously addressed, constitute reversible error. Consequently, they are not bases upon which to grant the appellant a new trial.

## IV. AN ASSERTION OF ERROR DURING THE PENALTY PHASE OF THE APPELLANT'S TRIAL.

■ The appellant requests that this Court vacate his death sentence and impose a sentence of life in prison because the prosecutor inflamed the passions and prejudices of the jury so as to deprive him of a fair and impartial sentence. See 42 Pa.C.S. § 9711(h)(3)(i). This proposition is based on that part of the prosecutor's summation during the penalty phase of the trial in which he stated.

[BY THE PROSECUTOR]

The point here is this, ladies and gentlemen, this case, in the words of Judge Ivins when he first directed his comments to you when you came in here with your respective panel and he talked to you about the death penalty, is the appropriate case in which there exist the appropriate circumstances to impose the death penalty.

N.T. 3/15/85, 24–25.

This comment harkens back to the question the trial judge posed to each of the three panels of veniremen from which the jury was ultimately derived:

Do any of you have any moral or philosophical objections to considering the imposition of the death penalty under appropriate circumstances or in an appropriate case?

If so, please raise your hand.

N.T. 3/5/86, 36; N.T. 3/7/86, 33; N.T. 3/8/86, 34.

It is apparent in this instance that the prosecutor's remark was intended to remind the jurors that they had been made aware of the possibility of such a sentence before they were selected to hear the case, and that this was the phase of trial when the potential for considering that penalty had ripened. The prosecutor informed the jury that the time to consider the death penalty for Willie Sneed had arrived by affirmatively referring back to the interrogatory which introduced that penalty into their consciousness. Considered in this context the prosecutor's argument was not of a character to inflame the passions and prejudices of the jury, nor intended to evoke the imprimatur of the trial judge with respect to a death sentence.

▮ The prosecutor is permitted, by the terms of the statute, to argue in favor of the death penalty. 42 Pa.C.S. § 9711(a)(3). This rule recognizes the reality that the balance of principles governing the course of argument during the guilt phase of trial are altered during the penalty phase of trial. *See Commonwealth v. Travaglia,* 502 Pa. 474, 501–2, 467 A.2d 288, 302 (1983) *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984). The prosecutor *must* be permitted to argue the appropriateness of the death penalty as applied to the circumstances because that is the only issue before the jury at the penalty phase of trial.

The appellant's argument of error during the penalty phase of his trial is meritless.

## V. PROPORTIONALITY

▮ In addition to a review of the sufficiency of the evidence when the death penalty has been imposed this Court also determines *sua sponte* whether that punishment is disproportionate considering the circumstances of the

crime. 42 Pa.C.S. § 9711(h)(3)(iii). *See Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

The jury in the instant case found two aggravating [10] and no mitigating circumstances.[11] The Sentencing Code is clear that the penalty must be death where the jury finds at least one aggravating and no mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv). Of the eleven other instances where the jury has been presented circumstances similar to the case at bar, a sentence of death has been returned ten times.[12] Therefore, this penalty as imposed on the appellant is in proportion to the circumstances of his offense.

\* \* \* \* \* \*

For the foregoing reasons, we sustain the conviction of murder in the first degree and affirm the sentence of death.[13]

**10.**  42 Pa.C.S. §§ 9711(d)(9); (10).

In this regard the jury relied upon the appellant's conviction of murder in the second degree two weeks prior to his trial on this charge for which he received a sentence of life in prison. That conviction, for a shooting which occurred three days prior to that of Hawkins, has been upheld by the Superior Court. *Commonwealth v. Sneed,* 362 Pa.Super. 640, 520 A.2d 1217 (1986).

**11.**  At the sentencing hearing the appellant argued that his drug abuse and dependency were mitigating factors. Specifically, he argued his drug habit had the following impacts: he was in a state of extreme emotional and mental disturbance; his capacity to appreciate the criminality of his acts was impaired; and he was in a state of extreme duress. Additionally, the appellant pointed to the victim's role as a drug pusher attempting to cheat a client as a mitigating factor.

To the extent that these arguments were valid mitigating circumstances within the statute the jury clearly did not believe them. As its verdict slip indicates, the jury found no mitigating circumstances existed.

**12.**  In one of these cases the jury was hung as to whether to impose the death penalty. Accordingly, the trial court sentenced the defendant to life in prison.

In another of these cases the jury returned a sentence of death which the trial court altered to become life in prison. This was necessitated by the jury's reliance on erroneous information concerning a prior felony conviction for aggravated assault.

**13.**  The prothonotary of the Eastern District is directed to transmit to the Governor a full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court. 42 Pa.C.S. § 9711(i).