713 A.2d 596

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Keith E. SNYDER, Appellant.**

Supreme Court of Pennsylvania.

Submitted on Briefs April 23, 1998.

Decided May 19, 1998.

John P. Moses, Charles P. Gelso, Wilkes Barre, for Keith E. Snyder.

Peter Paul Olszewski, Michael G. Nast, Wilkes Barre, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

NEWMAN, Justice.

Keith E. Snyder (Appellant) appeals from the Order of the Superior Court that affirmed the Judgment of Sentence of the Court of Common Pleas of Luzerne County (trial court) following his conviction for two counts of murder in the first degree.

The Commonwealth filed a criminal complaint charging the Appellant with two counts of murder eleven years and two months subsequent to the date of the alleged crimes and seven years after the conclusion of its investigation. Based on the limited record before us, it appears the only reason the Commonwealth arrested the Appellant was because the policies of the Luzerne County District Attorney's Office changed when a newly elected district attorney took office. This Court granted the Appellant's Petition for Allowance of Appeal to decide whether the extraordinary pre-arrest delay denied the Appellant due process of law. We reverse the Superior Court's Order and remand this case to the trial court.

### FACTS

On July 2, 1982, Appellant's wife and six-week-old son died in a fire inside their home in Wright Township, Luzerne County, Pennsylvania. The Appellant was scheduled to work from 1:00 p.m. until 10:00 p.m. on the day of the fire. Earlier that day, a neighbor saw the Appellant leave the house between 12:15 and 12:20 p.m. Later, two young boys, ages nine and twelve, were playing in a neighbor's yard when they saw the Snyder house was on fire and ran to the house. Unable to enter the house because the front door was locked, they told a neighbor who notified the fire department at 1:31 p.m. Fire fighters arrived within approximately four minutes and found the Appellant's wife and child in the master bedroom, both dead from carbon monoxide poisoning. Autopsy tests revealed barbiturates and alcohol in Mrs. Snyder's blood, with a blood alcohol content of .046%. The Commonwealth's expert witness opined that the fire was incendiary in nature,

and that it was deprived of oxygen, which caused it to smolder for approximately one hour, filling the house with smoke.

Immediately after this incident, the Wright Township Police Department, Pennsylvania State Police, and the Luzerne County District Attorney's Office commenced an investigation, which did not yield any arrests after two years. In 1984, the Luzerne County District Attorney empaneled a special investigating grand jury to probe the deaths of Mrs. Snyder and her child. The grand jury investigation continued until some time in 1986, when it ended without returning any indictments.

The Appellant continued to live and work in Luzerne County, and the investigation remained dormant throughout the administrations of several District Attorneys. No new or additional evidence became known after the grand jury concluded its investigation in 1986. During 1993, the newly elected District Attorney of Luzerne County, Peter Paul Olszewski, Jr., reopened the case. The Commonwealth filed a criminal complaint charging the Appellant with two counts of murder on September 8, 1993.

A pretrial Motion to Dismiss the charges was filed in the trial court by the Appellant due to pre-arrest delay. He claimed that the passing of more than eleven years violated his due process rights pursuant to the Constitutions of the United States and Pennsylvania. The Appellant claimed that evidence rendered unavailable to him due to the passing of time was exculpatory and substantially prejudiced him in presenting his defense that his wife committed suicide. The Honorable Joseph M. Augello held evidentiary hearings at which the Appellant introduced evidence establishing that certain witnesses close to the decedent were dead or otherwise unavailable, and that other witnesses could not remember many facts because their memories had dimmed. The Appellant argued that these unavailable witnesses would have testified that Mrs. Snyder was severely depressed after the birth of her son and that their testimony would have proven that she committed suicide.

Specifically, Appellant presented the testimony of Matthew Berger, M.D., a psychiatrist with some experience in performing psychiatric autopsies.[1] He explained that a psychiatric autopsy is an assessment of the decedent's mental state immediately before death, and that the lapse of more than eleven years prevented him from performing a psychiatric autopsy to ascertain Diane Snyder's mental condition at the time of her death. Dr. Berger testified that because of the passage of time, he could not discover from close friends and family members who knew Mrs. Snyder pertinent facts to enable him to determine whether she suffered from psychiatric problems including post partum depression.

Other witnesses presented by the defense testified that with the passing of so much time rendered certain defense evidence unavailable at trial because people had died or could no longer remember relevant facts. The Appellant contends that these witnesses would have testified that Mrs. Snyder was severely depressed after the birth of her son. Specifically, Monsignor Nolan, who was the Snyders' family friend and parish priest, died before the Appellant's arrest. Monsignor Nolan had many contacts with Mrs. Snyder before her death because he was working with her to prepare for the baby's baptism, which was scheduled for the day after the fire. According to Marga-

1. One law review article describes psychiatric and psychological autopsies as "method[s] of examining a person's life and the circumstances leading to her suicide in an attempt to identify the factors contributing to the suicidal decision." Psychological Autopsies: Do they belong in the Courtroom?, Elizabeth Biffl, 24 Am.J.Crim.Law 123, Fall, 1996. Another law review article states the following:

Although psychological autopsies historically focused on determining the manner of death, suicide versus accidental death, natural death, or homicide, the technique can be defined more broadly to include techniques or a group of techniques whereby a mental health professional attempts to describe or discern the mental state of a deceased or missing person at some prior point in time. Bruce W. Ebert defined the psychological autopsy as a "process designed to assess a variety of factors including behavior, thoughts, feelings, and relationships of an individual who is deceased." Given this more expansive definition, psychological autopsy describes not only investigations/assessments designed to determine mode of death, but also any assessments of the prior mental state of a deceased person.

Psychological Autopsy: Clinical and Legal Perspectives, 37 St. Louis L.J. 607, 610, 1993.

ret Krupa, who drove the Monsignor to the Snyder home to administer the last rites, the Monsignor told her that after seeing the bodies in the house, he believed that Mrs. Snyder committed suicide. Because Monsignor Nolan died before the Commonwealth filed these charges, the Appellant could not present evidence concerning the basis for the Monsignor's opinion that Mrs. Snyder committed suicide.

The Appellant's father, George Snyder, was also deceased at the time of the trial. The Appellant's brother said that Mrs. Snyder's co-workers told George Snyder that she said good-bye to her co-workers the day before the fire. Appellant's brother also testified that Monsignor Nolan told the Appellant's father that he believed that Mrs. Snyder had committed suicide. Emil Howrath, Diane Snyder's father, also died before the trial. Amy Kochanski, a family friend, testified that the day after his daughter's death, Mr. Howrath told her that he had wished that his daughter did not watch "Midnight Offerings," a television movie, immediately before the fire.[2]

Mrs. Snyder's obstetrician, Walter Horan, M.D., was also unavailable to testify at trial. Dr. Horan's wife explained that he suffered from severe Alzheimer's disease that resulted in his inability to understand or answer questions. Mrs. Snyder's medical records reflect that she lost the weight from her pregnancy very quickly.[3]

**2.** The defense argued that this film, when considered in the context of Mrs. Snyder's heightened interest in supernatural occurrences, was a factor in her decision to commit suicide. At trial, the defense introduced evidence that Mrs. Snyder subscribed to periodicals dealing with astrology and psychic phenomena. In addition, she died on her birthday, which was also the day before the baptism of her son.

   The trial court viewed a videotape of Midnight Offerings, which the decedent allegedly watched two nights before the fire. The trial court stated that the movie involved witches, and at the end of the movie, a character in the movie threw herself and her daughter into a fire. In another scene, a character in the movie took sedatives and went to bed while someone started a fire in her bedroom. After viewing the movie, the trial court denied the Appellant's request for the jury to view the movie.

**3.** Before the birth of her son, Mrs. Snyder weighed 150 pounds. At the time of her death thirty-seven days later, she weighed 115 pounds. All together, she lost thirty-five pounds in thirty-seven days.

The Commonwealth did not offer any evidence or present any witnesses at the pre-trial hearing. At the conclusion of the evidentiary hearing, Judge Augello denied the Appellant's motion to dismiss the charges based on pre-arrest delay. The Honorable Hugh F. Mundy was assigned the trial. Judge Mundy also entertained oral argument on the issue of pre-arrest delay, and he agreed that the Appellant was not entitled to a dismissal of the charges. In his Opinion, Judge Mundy held that the passing of time did not cause the Appellant substantial prejudice. Although he acknowledged that some witnesses had died, and the memories of others had faded, Judge Mundy held that the evidence Appellant sought to present "was either not exculpatory, or was capable of being presented through other witnesses." Trial Court Opinion, p. 7. Judge Mundy concluded that because the Appellant did not sustain his burden of proving substantial prejudice, "there was neither reason nor requirement to determine whether the investigatory delay was intentional or proper."[4] Trial Court Opinion, p. 9.

Following trial, a jury convicted Appellant of arson and two counts of first-degree murder. The jury returned sentences of life imprisonment for each charge of first degree murder, and the trial court sentenced the Appellant to two consecutive terms of life imprisonment, with a concurrent five year prison term for the arson conviction. The Superior Court affirmed the judgment of sentence on September 13, 1995, in a Memorandum Opinion.

This Court granted the Appellant's Petition for Allowance of Appeal to decide whether pre-arrest delay of more than eleven years denied him due process of law.[5] Because the trial court

4. Although Judge Mundy labeled the period of time between Mrs. Snyder's death and the Appellant's arrest as "investigatory delay," there is no basis in the record to conclude that this delay was required for further investigation. To the contrary, there is no evidence in the record to establish that any additional investigation occurred in this case after 1986.

5. Appellant also alleges a violation of his speedy trial rights pursuant to the Sixth Amendment of the United States Constitution. *See e.g., Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Howev-

erred when it held that there was no requirement to consider the Commonwealth's reasons for postponing the filing of charges, we reverse the Order of the Superior Court and remand this case to the trial court.

## DISCUSSION

In Pennsylvania, there is no statute of limitations that applies to murder prosecutions. 42 Pa.C.S. § 5551. Our appellate courts have affirmed convictions in numerous cases in which defendants were arrested and convicted of homicide charges many years after the commission of a crime due to lengthy investigations and/or recently discovered evidence. See *Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385 (1987) (four years); *Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749 (1987) (more than three years); *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986) (more than three years); *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978) (six years and nine months); *Commonwealth v. Crawford*, 468 Pa. 565, 364 A.2d 660 (1976) (almost four years); *Commonwealth v. Rico*, 443 Pa.Super. 507, 662 A.2d 1076 (1995) (more than seven years); *Commonwealth v. McCauley*, 403 Pa.Super. 262, 588 A.2d 941 (1991) (twelve years); *Commonwealth v. Akers*, 392 Pa.Super. 170, 572 A.2d 746 (1990) (thirteen years); *Commonwealth v. Patterson*, 392 Pa.Super. 331, 572 A.2d 1258 (1990) (twenty-two years); *Commonwealth v. Grazier*, 391 Pa.Super. 202, 570 A.2d 1054 (1990) (six years and nine months); *Commonwealth v. Arnold*, 331 Pa.Super. 345, 480 A.2d 1066 (1984) (fifteen months).

However, statutes of limitation do not define the full extent of the rights of the accused concerning the time in which charges can be filed. The constitutional right to due

er, this Court granted the Petition for Allowance of Appeal limited to the issue of whether the delay constituted a violation of the Appellant's due process rights. Thus, we will not address the speedy trial issue. In addition, we note that the Appellant does not allege a violation of Rule 1100 of the Pennsylvania Rules of Criminal Procedure, which proscribes undue delay between arrest and trial.

process also protects defendants from having to defend stale charges, and criminal charges should be dismissed if improper pre-arrest delay causes prejudice to the defendant's right to a fair trial. *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978). Section 1 of the Fourteenth Amendment to the United States Constitution, in pertinent part, declares that "no state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

Article I, Section 9 of the Constitution of Pennsylvania is commonly referred to as the due process clause of our state constitution, and provides as follows:

> [N]or can an accused be deprived of his life, liberty, or property unless by the judgment of his peers or the law of the land.

This Court has held that the phrase "law of the land" is equivalent to the due process language in the United States Constitution. *Commonwealth v. Davis*, 526 Pa. 428, 586 A.2d 914 (1991).

In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the United States Supreme Court addressed the issue of when pre-arrest delay constitutes a deprivation of due process pursuant to the United States Constitution. The defendants in *Marion* moved to dismiss the indictments against them, claiming the government returned the indictments following "an unreasonably oppressive and unjustifiable time after the alleged offenses," and that the three-year wait deprived them of rights to due process of law and a speedy trial as secured by the Fifth and Sixth Amendments. No specific prejudice was alleged by the defendants in *Marion*, but they argued that defending the indictments required the memory of many specific acts and conversations occurring several years before, and the cause of the late filing of charges was the prosecutor's negligence or indifference in investigating the case and presenting it to the grand jury.

After a pre-trial hearing, the United States District Court granted the defendants' motion and dismissed the indictments, holding that the defense was "bound to have been seriously

prejudiced" by the three-year delay. 404 U.S. at 310, 92 S.Ct. at 458, 30 L.Ed.2d at 472. The Government took a direct appeal to the United States Supreme Court, which reversed the District Court and held that the Due Process Clause may provide a basis for dismissing an indictment if the defense can show at trial that prosecutorial delay has prejudiced the defendant's right to a fair trial. However, the Court held that the defendants in *Marion* neither alleged nor proved actual prejudice resulting from the passage of time and their pre-trial due process claims were therefore speculative and premature in the pre-trial posture of the case.

The United States Supreme Court further explained its *Marion* decision in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), in which case the government filed indictments against the defendant more than eighteen months after he allegedly possessed firearms stolen from the United States mail and sold them without a license. Within the first month of the investigation, the defendant admitted to government agents that he had possessed and sold some of the stolen guns, and agents had developed strong evidence linking him to the other weapons. Investigators uncovered little additional evidence in the next seventeen months.

The defendant moved to dismiss the charges due to pre-indictment delay and the District Court held that the defendant suffered prejudice because a material witness died, and the indictment was dismissed. The Court of Appeals affirmed, *United States v. Lovasco,* 532 F.2d 59 (8th Cir.Mo. 1976), and the United States Supreme Court reversed. Although there was no evidence in the record concerning the reasons for waiting eighteen months to file the indictment, the United States Supreme Court relied on the prosecutor's representations to the District Court and Court of Appeals, as well as the prosecutor's repeated assertions in its pleadings and during oral argument before the United States Supreme Court that an ongoing investigation necessitated the postponement of filing charges.

■ Based on counsel's representations, the United States Supreme Court concluded that investigatory delay postponed the filing of the indictment, and the Court held that prosecuting a defendant following such an investigation was proper. The Court further reasoned that the Due Process Clause of the United States Constitution did not require a dismissal of the indictment because of an investigation, even if the lapse of time might have somewhat prejudiced the defense, stating the following:

> Thus, *Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.

*Lovasco* at 790, 97 S.Ct. at 2044, 52 L.Ed.2d at 752. In addition the Court stated that the defendants' pre-trial due process claims were speculative and premature, but noted that the events of the trial might prove actual prejudice. Thus, the *Marion* and *Lovasco* decisions stand for the proposition that to establish a due process violation for a delay in prosecution, a defendant must show that the passing of time caused actual prejudice and that the prosecution lacked sufficient and proper reasons for postponing the prosecution.

In 1978, this Court applied the holdings of *Marion* and *Lovasco* in *Daniels*, in which the police arrested the defendant six years and nine months after the homicide occurred. The victim in *Daniels* was twenty-one years of age and lived at a private boarding school for mentally retarded students. The defendant worked at the school as a night attendant, and numerous former residents testified that Daniels engaged in an ongoing pattern of violent physical abuse against the victim until he became seriously ill and died on May 19, 1967. The abuse included prolonged exposure to cold weather while naked, immersing his head under water, and violent beatings resulting in broken bones.

No one claimed the victim's body, which was sent to Temple University Medical School and was eventually cremated without an autopsy being performed. The Commonwealth's expert testified that the cause of the victim's death was bronchial

pneumonia, which was the result of the multiple factors including dehydration, physical abuse that weakened the victim, a prior ongoing infection that made him more susceptible to the effects of physical and climatologic abuse, and the accelerating process of pneumonia. He further testified that the defendant's abuse of the victim accelerated the disease process and caused his death.

The victim in *Daniels* died on May 19, 1967, and the defendant was arrested on January 28, 1974, more than six years and eight months later. The defendant filed an application to dismiss the indictment because of pre-arrest delay, which the trial court denied. Daniels was convicted by the jury of involuntary manslaughter. On appeal, this Court affirmed Daniels' conviction, noting that there was no evidence in *Daniels* exhibiting that material defense witnesses became unavailable before the defendant's arrest.

Daniels claimed that insanity or alibi defenses might have been available to him if his arrest had occurred sooner. This Court rejected those assertions because the testimony that identified him as the victim's abuser was substantial and unequivocal. Our Court also stated that the defendant's own testimony established that he was regularly employed on the night shift at the school and that he was present at work on the night before the victim's death, concluding that Daniels' alleged insanity or alibi defenses were no more than speculation.

Furthermore, the investigation regarding the victim's death in *Daniels* was long and complex, and involved police inquiry into numerous other suspicious deaths at the school beginning in October 1972. The police interviewed more than 100 former residents, who by the time of the investigation, were widely dispersed. Adding to the difficulties were the residents' mental infirmities, the unavailability of the deceased's body, lack of an autopsy, and the former management of the school hindering the investigations. This Court also noted that there was no basis to conclude that the pre-arrest delay in *Daniels* "was an intentional device to gain tactical advantage over the accused," citing *Marion*, 404 U.S. at 324, 92

S.Ct. at 465, 30 L.Ed.2d at 481. *See also, Lovasco,* 431 U.S. at 795 & n. 17, 97 S.Ct. at 2051 n. 17, 52 L.Ed.2d at 762 & n. 17.

Although this Court's Opinion in *Daniels* did not differentiate between the due process provisions of the Constitutions of the United States and Pennsylvania, our analysis is the same pursuant to both due process clauses. This Court has chosen to extend greater protections to criminal defendants pursuant to our state Constitution than federal courts have recognized pursuant to the United States Constitution in other areas of constitutional law,[6] but this Court has never afforded defendants greater protections when examining due process challenges based on pre-arrest delay.

Instead, we have held that the phrase "law of the land" in the due process clause of the Pennsylvania Constitution has the same meaning as the due process language in the United States Constitution. *Davis. See also, Commonwealth v. Lindenmuth,* 381 Pa.Super. 398, 554 A.2d 62 (1989) ("as it relates to due process guarantees, our state constitution affords no greater protection than the United States Constitution"); *Coades v. Pennsylvania Board of Probation and Parole,* 84 Pa.Cmwlth. 484, 480 A.2d 1298 (1984) (a review of this Court's decisions interpreting our State Constitution indicates that the due process guarantees of our Constitution are no greater than those afforded by the federal constitution). We therefore decline to hold, as the Appellant argues, that the due process clause of the Pennsylvania Constitution provides defendants greater protections than the United States Constitution in the area of pre-arrest delay. Therefore, our analysis here is based on the due process provisions of both our federal and state constitutions.[7]

6. *See, e.g., Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991) (in which this Court held that Article I, Section 8 of the Pennsylvania Constitution gives defendants greater protections than the Fourth Amendment of the United States Constitution and refused to recognized a "good faith" exception to the exclusionary rule stating that to do so would frustrate the guarantees embodied in our state Constitution).

7. The Commonwealth asks this Court not to consider the Appellant's claims pursuant to the Pennsylvania Constitution because they are

*Marion* and *Lovasco* require that we first determine whether pre-indictment delay in this case resulted in actual prejudice to the Appellant. The Commonwealth's case against the Appellant was based on circumstantial evidence and the inferences arising from them, and they established that Mrs. Snyder had barbiturates in her system and that someone had ignited a trail of gasoline and oil throughout the house. The Commonwealth's theory was that the Appellant drugged his wife, started the fire, left his house between 12:15 and 12:20 p.m., and the fire smoldered for approximately one hour before the children discovered it.

At trial, the Commonwealth also sought to counter the Appellant's defense that Mrs. Snyder was depressed and committed suicide by taking barbiturates and setting fire to the house, killing herself and her son. To establish Mrs. Snyder's state of mind, the Commonwealth introduced extensive evidence including the testimony of twelve lay witnesses who testified that they had contacts with her shortly before death and she appeared happy after the birth of her child.

After the Commonwealth raised the issue of Mrs. Snyder's state of mind in its case-in-chief, the defense attempted to rebut that evidence with contrary evidence showing she was depressed before her death. The Appellant testified on his own behalf and introduced the testimony of three other witnesses who had contact with Mrs. Snyder before she died.[8] Forensic pathologist Cyril Wecht, M.D., also testified as a

waived. According to the Commonwealth, the Appellant's state constitutional claim "was not raised in the Petition for Allowance of Appeal and not raised or preserved at any stage below." Brief of Appellee, p. 12. We reject this assertion.

To the contrary, the record reveals that the Appellant raised this issue in his omnibus pre-trial motion, in his brief to the Superior Court, and in his Petition for Allowance of Appeal to this Court. Accordingly, the Appellant's state constitutional claims are not waived. Furthermore, we note that the Appellant's brief contains a thorough discussion pursuant to *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), which sets forth a specific constitutional analysis to be used when defendants in criminal cases argue that the Pennsylvania Constitution provides greater protections than the United States Constitution.

8. Pamela Barnes, Mary McCullough, and Lois Chapman testified that the decedent appeared to be depressed after the birth of her child.

defense witness, and opined that his review of all of the available evidence led him to conclude that Mrs. Snyder committed suicide. The Appellant's toxicologist testified that the barbiturates in Mrs. Snyder's system could not have been given to her secretly in food or a drink because they had a bad taste.

In addition to the witnesses who became unavailable because of the passing of time, the record is replete with instances where prosecution and defense witnesses who changed their testimony or could not remember specific details when they testified at trial. For example, George Hudock, M.D., a forensic pathologist who performed an autopsy on Mrs. Snyder, testified at the preliminary hearing that he had not prepared any slides in this case. He later testified that he did prepare slides, but that he had forgotten that fact due to the lapse of time.

At the completion of the trial, the jury was faced with two diametrically opposed theories. The Commonwealth argued that Mrs. Snyder was happy after the birth of her son and that the Appellant killed her. The defense argued that Mrs. Snyder was depressed and that she killed herself. Just as the Commonwealth's case against the Appellant was entirely circumstantial, the Appellant's defense that she had committed suicide was dependent upon using circumstantial evidence to establish Mrs. Snyder's depressed mental state immediately before her death.

Because of the developments in the case at trial, the Commonwealth introducing considerable evidence concerning Mrs. Snyder's state of mind, and the unavailability of key witnesses close to Mrs. Snyder, we conclude that the Commonwealth's failure to file these charges sooner resulted in actual prejudice to the Appellant in presenting his defense at trial.

Looking to the second prong of the *Marion/Lovasco* test, we must next decide whether the Commonwealth's reasons for postponing the Appellant's arrest were proper. Although it is clear from the record that this investigation was

dormant from 1986 until 1993, and no new evidence surfaced during that time, the record is totally devoid of evidence establishing the reason for deferring the Appellant's arrest. The trial court held that because the Appellant did not sustain his burden of proving **substantial** prejudice, it was not required to determine whether the pre-arrest delay was proper or improper. We disagree.

*Marion* used the phrase "actual prejudice" as well as "substantial prejudice" to describe a defendant's burden of proving a due process violation due to pre-arrest delay. The Court nevertheless first stated the following:

> [T]he Due Process Clause ... would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused *substantial prejudice* to [defendants'] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.

*Marion* at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 481 (citations and footnote omitted)(emphasis added). The Court also stated the following:

> Nor have appellees adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No *actual prejudice* to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate *actual prejudice*, but at the present time appellees' due process claims are speculative and premature.

*Marion* at 325—326, 92 S.Ct. at 466, 30 L.Ed.2d at 481–482 (emphasis added). In *Lovasco,* the Court interpreted *Marion* as follows:

> "[Marion] establishes only that proof of *actual prejudice* makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid ... Marion makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim...."

*Lovasco* at 789, 97 S.Ct. at 2048, 52 L.Ed.2d at 759 (emphasis added). Furthermore, both *Marion* and *Lovasco* involved cases in which the Court held that the government had valid, investigatory reasons for postponing the filing of indictments. Thus, our due process inquiry must consider the reasons for the delay and whether it resulted in actual prejudice to the accused.

The Commonwealth relies on *Colson* to support its position that it was not required to prosecute the Appellant sooner. In *Colson,* this Court rejected a claim that a defendant was denied due process of law by the passing of more than three years before his arrest. The defendant argued that certain potential defense witnesses were dead or could not be located, those who could be found no longer had independent recollections of events, and that the defendant himself no longer had a clear memory of events at the time of the murder. However, the defendant and his co-defendants had fled the Commonwealth by the time the State Police had probable cause to arrest them. Later, the State Police learned that the defendant was in Wisconsin and Florida at different times, and they followed leads in both states and ultimately discovered and arrested the defendant in Tampa, Florida.

Based on these facts, this Court held that there was no evidence to support the defendant's claim that he suffered prejudice because the defendant had notice that he was a suspect, he fled from the Commonwealth, and he made incriminating statements to other witnesses that he committed the murder. We concluded that there was no due process violation because the pre-arrest delay was reasonable in view of

the initial difficulty experienced by the police in ascertaining the facts, the defendant's flight from the Commonwealth, and the diligent efforts to find all of the suspects. Thus, the Commonwealth's diligence in *Colson* makes that case readily distinguishable from the present case, in which there is no evidence that the Commonwealth diligently pursued this investigation.

In *Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749 (1987), the Commonwealth waited more than three years to arrest the defendant, and the defendant claimed prejudice because two witnesses died before his arrest. However, in *Sneed*, the police did not gather sufficient evidence to arrest the defendant, nor did they know where he was, because the defendant fled to Georgia, where he was arrested on unrelated charges. His cellmates in Georgia then provided information to prison authorities about the defendant's involvement in the Pennsylvania murder, and when Georgia police contacted the Philadelphia police, they reactivated their investigation.

The new information enabled the police and district attorney's office to locate and persuade witnesses to testify at Sneed's trial. One witness testified that the defendant admitted that he shot and killed the victim. Therefore, the defendant caused the passage of time in *Sneed*, rather than law enforcement authorities. This Court held that even if Sneed had met this threshold of showing prejudice, which he did not, he would not have been entitled to relief because the Commonwealth's reasons for the deferring the defendant's arrest were proper. This case is distinguishable from *Sneed* because the Commonwealth's efforts to bring him to trial do not appear in the record.

We conclude that the trial court committed an error of law when it held that the Appellant did not sustain his burden of proving prejudice. Based on the record before us, we hold that the Appellant did establish actual prejudice, and our due process inquiry must therefore analyze whether there were proper reasons for waiting to arrest the Appellant. The record is silent concerning the existence of any proper reasons for delaying the filing of criminal charges.

The Appellant does not argue that the prior District Attorneys of Luzerne County intentionally postponed this prosecution to gain a tactical advantage over the Appellant. It appears that the prosecutors, in the exercise of their discretion, decided for reasons that do not appear in the record, that this case lacked prosecutorial merit. Nor is there any basis to conclude that District Attorney Olszewski intentionally continued to defer this prosecution for inappropriate reasons. However, the Appellant asserts that reviving this dormant investigation and filing homicide charges against him was improper, eleven years after Mrs. Snyder's death, based solely on changed policies of the District Attorney's Office.

Whether done intentionally or not, the Commonwealth gained a tremendous strategical advantage against the Appellant due to the passage of time and the loss of critical defense testimony through death and memory loss. This Court expressly disapproves of subjecting defendants to delayed prosecutions in cases in which changing prosecutorial policies are the only reason to revive dormant investigations after the passage of time causes actual prejudice to the defense. We hold that, based on all of the facts of this case, bringing this prosecution after more than eleven years caused actual prejudice to the Appellant and deprived him of due process of law unless there were proper reasons for the delay.

We emphasize that due process violations will occur in only extreme cases, in which no valid reasons justify a defendant's arrest after an inordinate amount of time without investigation. This Court recognizes that murder prosecutions often come to fruition after many years of investigation. We do not intend to limit the power of the Commonwealth to prosecute a murderer if and when an investigation yields new evidence after many years of inactivity. However, if no additional evidence appears, the delay results in actual prejudice to the defendant, and there are no proper reasons for postponing the defendant's arrest, the due process clauses of the Constitutions of the United States and Pennsylvania require that the charges be dismissed.

We agree with the Commonwealth that courts should apply a standard of review that pays "substantial deference" to the powers of the executive branch of government in deciding when to file criminal charges. In *Daniels*, we stated the following:

"There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." *Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374, 386 (1966), quoted in *Marion*, supra, 404 U.S. at 325 n. 18, 92 S.Ct. at 465 n. 18, 30 L.Ed.2d at 481 n. 18, and *Lovasco*, supra, 431 U.S. at 792 n. 13, 97 S.Ct. at 2050, 52 L.Ed.2d at 760 n. 13.

And, as the Court in *Lovasco* further explained, there is no such "right to prosecution" even when sufficient evidence has been adduced to prove guilt beyond a reasonable doubt. Such a right "would pressure prosecutors into resolving doubtful cases in favor of early—and possibly unwarranted—prosecutions," and would "preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases." 431 U.S. at 794, 97 S.Ct. at 2051, 52 L.Ed.2d at 761. We decline to adopt a contrary rule, even assuming that there was sufficient evidence to warrant prosecution at the times asserted by appellant.

*Daniels* at 355, 390 A.2d at 180. However, we hold that the decision to prosecute the Appellant after more than eleven years, with no additional evidence and with no ongoing investigation in the last seven years, is so egregious that it cannot withstand even the most deferential standard of review.

## CONCLUSION

Because the trial court erred when it held it was not required to judge whether the pre-arrest delay was proper, the record is incomplete concerning the cause of the extensive pre-arrest delay. Accordingly, we must remand this case to the trial court for the limited purpose of discovering if there were valid reasons to justify filing these charges after this extensive period of time. On remand, the trial court shall determine whether the Commonwealth's delay was proper or improper. Because the excessive lapse of time caused actual prejudice to the Appellant, the absence of valid reasons to justify the late filing of charges will mandate the trial court to vacate the judgment of sentence and discharge the Appellant.

Accordingly, we reverse the Order of the Superior Court and remand this case to the trial court for further proceedings consistent with this Opinion.

ZAPPALA, J., files a concurring and dissenting opinion in which FLAHERTY and CAPPY, JJ., join.

ZAPPALA, Justice, concurring and dissenting.

I join the majority opinion, except for the determination that a remand is necessary for the purpose of discovering whether there were valid reasons to justify the unusual delay of eleven years after the deaths of Appellant's wife and child in filing the charges against Appellant. The trial court conducted a pre-trial hearing to address Appellant's motion to dismiss the charges due to pre-arrest delay. The Commonwealth had sufficient opportunity to introduce evidence of its reasons for the delay at that hearing. There is no legitimate reason to allow the Commonwealth a second opportunity to explain or justify the delay.

The trial court did not foreclose the Commonwealth from introducing any evidence at the pre-trial hearing to refute Appellant's claim that the pre-arrest delay violated his due process rights under the state and federal constitutions. The Commonwealth took the position that the evidence offered by Appellant at the pre-trial hearing failed to establish substan-

tial prejudice because of the delay. We have concluded, however, that the Commonwealth's failure to file the charges sooner resulted in actual prejudice to Appellant in presenting his defense at trial. The Commonwealth's failure to supplement its position at the pre-trial hearing with evidence that the delay was justifiable does not entitle it to another hearing to rectify that omission. The Commonwealth simply chose not to introduce evidence to explain the delay, although it had the opportunity to do so.

Because of the absence of any evidence on this record to justify the delay, I would vacate the judgment of sentence and discharge Appellant. To hold otherwise would create a dangerous precedent of allowing a party to present evidence at a second evidentiary hearing that was available at the original hearing but not offered. In this case, the Commonwealth felt that it would be successful in arguing the absence of prejudice to Appellant and proceeded on that assumption at the pre-trial hearing. The record is not incomplete, as the majority suggests. Having elected not to submit evidence that the delay was justifiable, the record is complete but inadequate to support the Commonwealth's position.

Appellant introduced evidence at the pre-trial hearing that established that the Commonwealth was prepared to prosecute him by August 1986, but that prosecution was delayed for a period of over seven years [1]. This evidence satisfied Appellant's burden of proof and is sufficient to support a determination that the delay was improper. The Commonwealth offered no evidence in rebuttal. The trial court found it was unnecessary to determine whether the delay was proper based upon its conclusion that Appellant had not met his burden of establishing substantial prejudice. Since we have determined that the trial court erred and that substantial prejudice was demonstrated by Appellant, and no evidence exists in the

1. In August 1986, four years after the deaths of Diane Snyder and her child, a special investigating grand jury was impaneled in Luzerne County to investigate the deaths.

record to find that the delay was proper, Appellant should be discharged.

FLAHERTY and CAPPY, JJ., join this Concurring and Dissenting Opinion.