899 A.2d 1067

COMMONWEALTH of Pennsylvania, Appellant,

v.

**Willie SNEED, Appellee.**

Supreme Court of Pennsylvania.

Submitted April 14, 2005.

Decided June 19, 2006.

Reargument Denied Sept. 6, 2006.

322

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Harrisburg, for the Commonwealth of Pennsylvania.

Billy Horatio Nolas, Esq., Philadelphia, for Willie Sneed.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Justice CASTILLE.

The instant matter is an appeal by the Commonwealth from the order of the Court of Common Pleas granting Willie Sneed, appellee herein, a new trial and new penalty hearing pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* For the reasons that follow, we affirm the PCRA court's order to the extent that it granted a new penalty hearing, but we vacate the grant of a new trial.

On March 14, 1985, a jury sitting before the Honorable George J. Ivins convicted appellee of first degree murder [1] and possession of an instrument of crime.[2] According to the facts of record, the convictions arose from an incident occurring in Philadelphia in which appellee shot and killed Calvin Hawkins following appellee being deceived by Hawkins and two other men who sold appellee aspirin instead of cocaine.[3] Following his conviction, the same jury found two aggravating circumstances and no mitigating circumstances, and, accordingly, sentenced appellee to death.[4] *See* 42 Pa.C.S. § 9711(c)(1)(iv) ("[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstance. . . ."). On direct appeal, this

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 907.

3. The facts underlying appellee's convictions are set forth in detail at *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987).

4. The two aggravating circumstances found by the jury were: (1) appellee had a "significant history of felony convictions involving the

Court affirmed appellee's convictions and sentences. *See Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749 (1987). Appellee did not file for *certiorari* in the United States Supreme Court.

On January 16, 1997, appellee filed a timely *pro se* PCRA petition.[5] Inexplicably, counsel was not assigned at that time; thus, appellee's PCRA petition was never reviewed. On July 20, 1999, then-Governor Thomas Ridge issued a warrant scheduling appellee's execution for September 14, 1999. Thereafter, on July 22, 1999, appellee, through newly appointed counsel, filed an emergency motion for a stay of execution. The PCRA court, per Judge Carolyn E. Temin, granted a stay of execution and ordered that an amended PCRA petition be filed. Subsequently, on April 12, 2000, appellee filed an amended PCRA petition raising twenty-five claims of error. Following a motion to dismiss filed by the Commonwealth, the PCRA court granted an evidentiary hearing on two issues: (1) whether the prosecutor at appellee's 1985 trial used his peremptory challenges in a racially discriminatory manner, thus violating *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and (2) whether trial counsel was ineffective for failing to develop and present available mitigating evidence at the penalty hearing. The PCRA court did not pass on the other claims raised. Evidentiary hearings were held approximately sixteen years after the fact on September 10–14, 2001, and on November 6, 2001. On January 4, 2002, the PCRA court granted appellee a new trial based on his *Batson* claim, and a new penalty hearing based on his ineffectiveness claim. This appeal followed.[6]

Presently, the Commonwealth challenges both grants of relief. With respect to the grant of a new trial based on an

use or threat of violence to the person," 42 Pa.C.S. § 9711(d)(9); and (2) appellee had a prior murder conviction, 42 Pa.C.S. § 9711(d)(10).

5. Appellee's petition was timely under 42 Pa.C.S. § 9545(b)(1), having been filed within one year of the effective date of the 1995 amendments to the PCRA. *See* The Act of November 17, 1995, P.L. 1118, No. 32 (Spec.Sess. No. 1), § 3(1).

6. This Court has jurisdiction over the Commonwealth's appeal as we directly review the grant of post-conviction relief in death penalty cases

alleged *Batson* violation, the Commonwealth argues that appellee was not entitled to retroactive application of the new rule of law announced in *Batson* because he failed to preserve such a claim at trial and on direct appeal. The Commonwealth further claims that the PCRA court erred in granting appellee a new penalty hearing, arguing that the mental health evaluation, upon which the PCRA court relied in awarding relief, was formulated twenty years after the murder took place and failed to consider appellee's conduct at the time of the crime itself. Also, with regard to this second claim, the Commonwealth contends that neither appellee nor his family members provided trial counsel with any indication that appellee suffered a disadvantaged childhood. We address the *Batson* issue first because if the grant of a new trial was proper, there would be no need to review the penalty phase ineffectiveness claim.

At the PCRA evidentiary hearing appellee presented evidence in the form of voter registration records that, of the four veniremembers known to be black, the prosecutor, Assistant District Attorney James Long, struck each of them. Appellee was also able to identify, again through voter registration records, that eight of the jurors were Caucasian. No evidence, however, was presented that identified the race of: (1) the remaining jurors; (2) the alternate jurors; (3) the other veniremembers struck by the prosecutor; (4) the veniremembers struck for cause by the court; and (5) the veniremembers struck by defense counsel. In response, the Commonwealth presented testimony from one of the seated jurors who testified that she specifically remembered that at least one of the seated jurors was black. N.T. 11/6/2001 at 3. Additionally, prosecutor Long testified that he never tried a case in front of an all-white jury, N.T. 9/14/2001 at 11, and that he struck the four black veniremembers for non-racial reasons, *id.* at 15–18.

under 42 Pa.C.S. § 9546(d) and Pa.R.Crim.P. 910. Our standard of review in such cases is whether the findings of the PCRA court are supported by the record and free from legal error. *Commonwealth v. Abu–Jamal*, 574 Pa. 724, 833 A.2d 719, 723 (2003), *cert. denied*, 541 U.S. 1048, 124 S.Ct. 2173, 158 L.Ed.2d 742 (2004).

In its Pa.R.A.P.1925(a) opinion, dated November 25, 2003, the PCRA court first determined that *Batson* applied retroactively to appellee's trial, even though *Batson* was decided after that trial, and while appellee's direct appeal was pending with this Court.[7] In support of this determination, the PCRA court relied on the United States Supreme Court decision in *Griffith v. Kentucky,* which held that *Batson's* "new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Griffith,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).[8] The PCRA court then determined that appellee did not waive his *Batson* claim, even though he did not raise it at trial or on direct appeal, because his trial counsel was also his appellate counsel; therefore, according to the court, collateral review was the earliest possible opportunity for appellee to raise any ineffectiveness claims.

▪ After making these determinations, the PCRA court addressed the merits of the *Batson* claim as if it were cognizable under the PCRA in its own right, ultimately deciding that appellee retroactively presented a *prima facie* showing of intentional discrimination, and that the race-neutral explanations for striking the four black veniremembers offered by the prosecutor were pretextual and not credible.[9] Notwithstanding its apparent consideration of this claim as if it were a

7. *Batson* was decided on April 30, 1986. Appellee's direct appeal was orally argued before this Court on December 1, 1986, and we issued our opinion on May 22, 1987.

8. *Griffith* actually consisted of two criminal cases: one state and one federal. The defendants in both cases, however, preserved at trial via objections a claim that the prosecutor improperly struck potential jurors in a racially discriminatory manner.

9. Notably, in making its retroactive finding that appellee proved a *prima facie* case of a *Batson* violation, the PCRA court did not apply this Court's precedent respecting the showing required. In order to facilitate a rational assessment of *Batson* claims, this Court has required that the party raising such a claim must make a full and complete record. Specifically, where the defendant forwards the objec-

preserved *Batson* claim, the PCRA court concluded its discussion of this issue with the following ineffective assistance of counsel analysis:

> The evidence shows that the sole record of the striking of the four black jurors was racially motivated and was a violation of *Batson*, and Counsel was ineffective for not raising this claim on appeal.

PCRA Court Op. at 7.

■ On appeal, the Commonwealth relies on this Court's decision in *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649 (2001), in support of its argument that the PCRA court erroneously granted appellee a new trial based on a waived *Batson* claim. In *Tilley*, a Caucasian defendant raised as one of his PCRA claims that the Commonwealth had improperly struck potential black jurors at trial based on their race in violation of *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991),[10] and *Batson*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.[11] In an attempt to develop this claim, the

tion (a *Batson* claim can be raised by either party), he must present a record identifying the race of veniremembers stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected. *See Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 84 (2004); *Commonwealth v. Holloway*, 559 Pa. 258, 739 A.2d 1039, 1045 (1999); *Commonwealth v. Bronshtein*, 547 Pa. 460, 691 A.2d 907, 915 (1997); *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176, 1182–83 (1993). *But see Uderra*, 862 A.2d at 87 n. 12 (Mr. Justice Saylor noting preference to follow Third Circuit's decision in *Holloway v. Horn*, 355 F.3d 707 (3d Cir.2004)). In addition, in *Uderra*, this Court held that a post-conviction petitioner asserting an unpreserved claim of racial discrimination in jury selection may not rely upon a *prima facie* case under *Batson*, but must prove actual, purposeful discrimination by a preponderance of the evidence. *Uderra*, 862 A.2d at 87 (citing *McCrory v. Henderson*, 82 F.3d 1243, 1251 (2d Cir.1996)). We recognize that the PCRA court did not have the benefit of the *Uderra* decision.

10. In *Powers*, the United States Supreme Court extended *Batson* and held that a criminal defendant, under the Equal Protection Clause, may object to race-based exclusions of veniremembers through peremptory challenges whether or not the defendant and the excluded veniremembers are of the same race. *Powers*, 499 U.S. at 409–10, 111 S.Ct. at 1370.

11. Notably, Tilley's trial took place in 1987, four years before *Powers*, and his direct appeal was pending before this Court when *Powers* was

defendant then filed a discovery motion seeking, *inter alia*, all data in the Commonwealth's custody concerning the racial composition of the jury empanelled at his trial, and all of the prosecutor's notes relating to jury selection in the case. The PCRA court granted the defendant's discovery request in full. On appeal, following this Court's preliminary decision to exercise jurisdiction pursuant to the Commonwealth's petition for review, we overturned the PCRA discovery order because it was in pursuit of a claim that was unavailable on PCRA review. In so holding, we noted that *Powers* could not be applied retroactively to the defendant's case because he did not challenge the Commonwealth's use of peremptory challenges at trial and on direct appeal. *Tilley*, 780 A.2d at 652. In support, this Court reiterated the following principle:

> Case law is clear ... that in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at "all stages of adjudication up to and including the direct appeal."

*Id.* (quoting *Commonwealth v. Cabeza*, 503 Pa. 228, 469 A.2d 146, 148 (1983)). The Commonwealth argues that here, as in *Tilley*, appellee did not challenge the Commonwealth's use of peremptory challenges at trial or on direct appeal. Thus, according to the Commonwealth, his failure to do so renders his *Batson* claim waived and thus unavailable on PCRA review.

Furthermore, the Commonwealth contends that the PCRA court's attempt to distinguish *Tilley* is unconvincing. Specifically, the PCRA court posited that *Tilley* was distinguishable because "[appellee] is black, his allegation of error is that the Commonwealth excluded black jurors and his direct appeal was open at the time that *Batson* was decided." PCRA Court Op. at 3. The Commonwealth contends, however, that appellee is in the very same material position as Tilley since appellee, like Tilley, did not raise a claim that the prosecutor struck jurors because of their race until collateral review. Thus, any

decided. Thus, the existing case law at the time of Tilley's trial did not recognize a claim by a white defendant that the Commonwealth improperly struck potential black jurors based on their race.

*Batson* claim, posed as such, is waived. The Commonwealth further contends that trial counsel cannot be held ineffective for failing to raise a *Batson* claim at *voir dire* since appellee's trial occurred before *Batson* was decided; and that counsel cannot be deemed ineffective for failing to raise a *Batson* claim on direct appeal because there was no evidence of record to support such a claim.

Alternatively, the Commonwealth contends that, even if appellee's *Batson* claim is not waived, he is still not entitled to relief because he did not set forth a *prima facie* case of purposeful discrimination in his collateral attack. The Commonwealth notes that appellee failed to establish the racial composition of all of the prospective jurors, and that one juror's testimony established that at least one member of the jury was black. Additionally, the Commonwealth highlights prosecutor Long's testimony that he had never tried a case in front of an all-white jury. On such a record, the Commonwealth submits, the determination of the PCRA court, who was not the trial judge, cannot withstand scrutiny.

In response, appellee contends that the PCRA court correctly determined that he established a *prima facie* case of racial discrimination in jury selection, and that prosecutor Long's reasons for striking black prospective jurors were incredible and pretextual, as his sole reason for striking these veniremembers was their race. Appellee further argues that because the Commonwealth offered race-neutral reasons via prosecutor Long's testimony, its challenge to the sufficiency of his *prima facie* case is rendered moot. Appellee additionally notes that the Commonwealth has failed to challenge on appeal both the PCRA court's finding that the prosecutor did not have race-neutral, non-discriminatory reasons for striking the four black veniremembers, and the PCRA court's retroactive finding of purposeful racial discrimination in jury selection.

Regarding the Commonwealth's retroactivity and waiver arguments, appellee reiterates the conclusions made by the PCRA court in its Rule 1925(b) opinion. Appellee first cites to *Griffith* for the assertion that *Batson* applies to his case since

his case was pending on appeal when *Batson* was decided. Appellee argues that *Tilley* is distinguishable as that case involved the question of the retroactivity of *Batson/Powers* in the case of a white defendant who represented himself on post-verdict motions and was represented by different attorneys at trial and on direct appeal. Appellee then argues that his *Batson* claim is not waived since these PCRA proceedings represent the first opportunity for him to raise prior counsel's ineffectiveness. In support of this non-waiver argument, appellee notes that this Court has previously addressed the merits of a *Batson* claim where *Batson* was decided while the case was pending on direct appeal, *see Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990), and the Superior Court has done the same, *see Commonwealth v. Wilson*, 371 Pa.Super. 42, 537 A.2d 370 (1988).[12] Finally, appellee, like the PCRA court, turns to a brief ineffectiveness analysis and concludes that his counsel should have raised a *Batson* claim on direct appeal, notwithstanding the absence of a trial record to support such a claim, and that the PCRA court properly decided that he was ineffective for failing to do so.

In *Batson*, the United States Supreme Court overruled that portion of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), concerning the evidentiary burden placed on a black criminal defendant who claimed that he was denied equal protection because of the exclusion of black prospective jurors. *Batson*, 476 U.S. at 82, 106 S.Ct. at 1714–15. Under *Swain*, a black defendant was required to prove that a prosecutor systematically and consistently excluded blacks from participation in jury service. *Id.* at 92–93, 106 S.Ct. at 1720–

**12.** It should be noted that these cases are clearly distinguishable. In *Hardcastle*, the defendant preserved his claim that the prosecutor's use of peremptory challenges was racially discriminatory by making a motion for a mistrial subsequent to *voir dire* and prior to trial. *Hardcastle*, 546 A.2d at 1104. The defendant thus anticipated *Batson*. In *Wilson*, it is unclear whether the defendant preserved the *Batson* claim at trial. Regardless, Superior Court decisions are not binding on this Court, and we certainly are not bound by a decision which may have misapprehended retroactivity principles.

21. The new test announced in *Batson* placed the initial burden on the defendant to prove that a prosecutor purposefully struck potential jurors because of their race, and, if satisfied, the burden would then shift to the prosecution to provide a race-neutral explanation for challenging black jurors. *Id.* at 93–98, 106 S.Ct. at 1721–24. *Batson* eased the equal protection burden by holding that the defendant need only show that the prosecution improperly exercised its peremptory challenges in his own case, rather than systematically over a number of cases. *Id.* at 95, 106 S.Ct. at 1722 ("[A] defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case.*").

It is well-settled that in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at all stages of adjudication, including at trial and on direct appeal. *Commonwealth v. Jones,* 571 Pa. 112, 811 A.2d 994, 1005 (2002); *Tilley,* 780 A.2d at 652; *Cabeza,* 469 A.2d at 148. Accordingly, the Commonwealth is correct that, in order for appellee to have been entitled to retroactive application of *Batson* on his direct appeal, he had to have challenged the Commonwealth's use of peremptory challenges at trial and on direct appeal. Appellee, however, did not do so; rather, he raised his *Batson* claim for the first time in his amended PCRA petition. Appellee would not be entitled to retroactive application of the *Batson* decision if this were a direct appeal, and he certainly is not entitled to its retroactive benefit on a collateral attack under the PCRA. For PCRA purposes, his *Batson qua Batson* claim is waived. *See* 42 Pa.C.S. § 9544(b).

What is cognizable and not waived under the PCRA would be a derivate claim that trial counsel was ineffective for failing to raise a *Batson* claim either at trial or on direct appeal, even if no objection had been raised at trial, under this Court's then-existing capital case relaxed waiver doctrine. To the extent appellee raised this distinct claim below, it is unclear whether he intended to pursue it under the Pennsylva-

nia Constitution, the Federal Constitution, or both; therefore, we shall assume that he intended to raise it under both charters. "It is settled that the test for counsel ineffectiveness is the same under both the Pennsylvania and Federal Constitutions: it is the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Commonwealth v. Gribble*, 580 Pa. 647, 863 A.2d 455, 460 (2004) (collecting cases).

To better focus the *Strickland* analysis, this Court has applied the performance part of the test by looking both to the arguable merit of the claim lodged against counsel as well as the objective reasonableness of the path taken, or not taken, by counsel. *E.g.*, [*Commonwealth v.]Bomar*, 573 Pa. 426, 826 A.2d [831,] 855 n. 19 [(2003), *cert. denied*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004)]. Thus, the constitutional ineffectiveness standard requires the defendant to rebut the presumption of professional competence by demonstrating that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. (Michael) Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001); *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 333 (1999). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *(Michael) Pierce*, 786 A.2d at 221–23; *see also Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 701 (1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met.").

*Commonwealth v. Spotz*, 582 Pa. 207, 870 A.2d 822, 829–30 (2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 564, 163 L.Ed.2d 474 (2005) (quoting *Gribble*, 863 A.2d at 460–61).

■ Counsel clearly cannot be faulted for failing to raise a *Batson* objection at trial because *Batson* did not yet exist. *See, e.g., Gribble,* 863 A.2d at 464 ("Counsel cannot be deemed ineffective for failing to predict developments or changes in the law."). With respect to counsel's performance on direct appeal, it is true that counsel at that time could have sought to raise a non-preserved *Batson* claim by invoking direct capital review relaxed waiver. In faulting counsel for failing to do so, however, appellee "ignores that this [C]ourt's relaxed waiver doctrine was discretionary, and thus, there was no guarantee that we would have analyzed this issue under the relaxed waiver doctrine." *Commonwealth v. Duffey,* 585 Pa. 493, 889 A.2d 56, 64 (2005) (citing *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 400 n. 9 (2003) ("The relaxed waiver practice . . . was not absolute, but discretionary.")).

Moreover, belatedly faulting counsel for failing to seek the benefit of the new *Batson* rule on direct appeal overlooks the practical hurdles that would have derailed such an endeavor. Because counsel did not anticipate the *Batson* rule (and/or because counsel apparently saw no evidence of purposeful discrimination in jury selection), there was no record upon which to construct an appellate *Batson* claim. *Batson* contemplated a central role for the trial judge both in assessing whether a *prima facie* case was made out, and if so, in assessing the credibility of the neutral reasons for peremptory strikes proffered by the lawyer who exercised them. *See Uderra,* 862 A.2d at 85–86. In this case, counsel had no such record or findings to rely upon. The fact-intensive nature of a *Batson* claim, thus, negates the notion that one could successfully argue such a claim for the first time on appeal, with no supporting record, and have any reasonable prospect of success.

For these reasons, the PCRA court's summary finding of counsel ineffectiveness is unsustainable. The PCRA court states that, "[t]he evidence shows that the sole record of the striking of the four black jurors was racially motivated and was a violation of *Batson,*" and therefore counsel was ineffective on appeal. But this "evidence" and "sole record" consists

of the incomplete, belated, and select PCRA record, not the trial record available to counsel on appeal. That trial record contained no *Batson* objection, no argument, no finding of a *prima facie* case, no statement of reasons for strikes in the face of a finding of a *prima facie* case, and no assessment of the credibility of those reasons. The PCRA court's finding of ineffectiveness failed to accord *any* deference to the presumption of effectiveness, or the fact that *Batson* was a new rule. Because the award of a new trial is unsustainable under *Batson*, or under *Strickland*, we vacate the order below granting a new trial.

The second issue on appeal concerns the PCRA court's finding that trial counsel was ineffective in his investigation and presentation of available mitigation evidence during the penalty phase. Specifically, appellee claimed below that counsel failed to: investigate his background or attain a life history; contact any family member other than one of his sisters; collect existing prison and probation records; collect existing prison mental health evaluations; and have appellee evaluated by a psychologist or any mental health expert. Moreover, appellee contended that counsel failed to present any character witnesses and, essentially, failed to present any mitigation defense whatsoever. Appellee argued that the evidence that was available and that counsel should have presented would have supported the following mitigating circumstances: that appellee was under the influence of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2); that the capacity of appellee to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, 42 Pa.C.S. § 9711(e)(3); and the catchall mitigator, 42 Pa.C.S. § 9711(e)(8) ("[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").

In granting a new penalty hearing, the PCRA court accepted the life history, record, and mental health mitigation evidence presented by appellee at the PCRA hearing, and found counsel ineffective in the following one paragraph analysis:

On the basis of the record this Court found that there was substantial information available at the time of trial that trial counsel should have investigated and that would have produced evidence to support the following statutory mitigating circumstances: the defendant was under the influence of extreme mental or emotional disturbance at the time the offense was committed[ ] (42 Pa.C.S. § 9711(e)(2)); the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (42 Pa.C.S. § 9711(e)(3)); and, other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense[ ] (42 Pa.C.S. § 9711(e)(8)). Trial counsel's failure to develop and present this evidence was not a strategic decision. This "decision" was without any reasonable basis. Indeed, it was virtually without basis because counsel did no investigation despite the availability of social history information at the time of trial. There is a substantial likelihood that, had the mitigation evidence presented at the PCRA hearings been presented at trial, the outcome of the penalty hearing would have been different.

PCRA Court Op. at 15–16.

On appeal, the Commonwealth minimizes the mental health evidence presented by appellee at the PCRA hearing, arguing that the defense psychiatrist, Dr. Richard D. Dudley, did not diagnose appellee with any major mental illness, that his examination of appellee was conducted twenty years after the murder, and that Dr. Dudley did not consider appellee's actual behavior or thoughts at the time of the murder. The Commonwealth further argues that the PCRA court ignored two mental health experts who conducted mental health evaluations of appellee in 1985 and found no evidence of any major mental disorder.[13] Moreover, the Commonwealth stresses the

13. On February 28, 1985, two weeks before appellee was convicted of the instant murder, Dr. Richard B. Saul, a psychiatrist, examined appellee in connection with a prior murder conviction. Dr. Saul diagnosed appellee as having mixed character disorder. On March 21, 1985, less than one week after appellee was sentenced to death, Dr. Joaquin Canals, a psychiatrist, conducted a sentence competency exam-

testimony of its mental health expert at the PCRA hearing, Dr. John S. O'Brien II, a psychiatrist, who examined appellee in September of 2000 and found no evidence in appellee's behavior at the time of the murder which would indicate that he was suffering from any extreme mental or emotional disturbance, or that appellee was suffering from any psychiatric or cognitive problem that could have substantially impaired his capacity to conform his conduct to the requirements of law. N.T. 9/13/01 at 46, 59–60, 64. The Commonwealth argues that appellee at the time of trial presented no sign of any significant mental illness warranting psychological examination or testing. In sum, the Commonwealth argues that counsel's penalty phase strategy of stressing appellee's drug addiction and its psychological effect on him was entirely reasonable and is supported by Dr. O'Brien's evaluation and diagnosis.

Regarding the dysfunctional childhood evidence counsel was faulted for failing to muster, the Commonwealth notes that at the time of trial, appellee merely informed counsel that he was raised in poverty, not that he was a victim of abuse. In addition, according to the Commonwealth, appellee did not provide counsel with any specific information regarding his family members, nor did his sister when she met with counsel. The Commonwealth highlights counsel's testimony that if appellee's sister had provided him with a shred of evidence that could have helped appellee, he would have called her as a witness at the penalty hearing. N.T. 9/13/01 at 6–8. Accordingly, the Commonwealth contends that counsel cannot be deemed ineffective for not presenting alleged mitigating evidence of which he justifiably was not aware. *See Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592, 601 (2000) (counsel not ineffective for failing to present evidence of sexual abuse because appellant and his family failed to reveal the abuse during interviews prior to trial).

Appellee responds that the PCRA court's finding of ineffective assistance of counsel was well-supported by the evidentia-

ination for the present case. Dr. Canals diagnosed appellee as having mixed personality disorder, with anti-social, schizoid, and paranoid features.

ry record developed at the PCRA hearing. Appellee cites to recent cases that have found trial counsel ineffective for failing to properly investigate and present available mitigation evidence, *see Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Commonwealth v. Moore,* 580 Pa. 279, 860 A.2d 88 (2004); *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767 (2004); *Commonwealth v. Ford,* 570 Pa. 378, 809 A.2d 325 (2002) (Opinion Announcing the Judgment of the Court), *cert. denied,* 540 U.S. 1150, 124 S.Ct. 1144, 157 L.Ed.2d 1044 (2004), and analogizes the instant case to those cases.

Regarding the Commonwealth's specific arguments, appellee contends that Dr. O'Brien's testimony at the PCRA hearing actually buttressed the mental health evidence presented on his own behalf, and thus supported his ineffectiveness claim. For example, appellee highlights Dr. O'Brien's testimony where he admitted that neglect, poverty, and abuse, such as that suffered by appellee, influences psychological functioning and childhood development. N.T. 9/13/01 at 62–63. Appellee further notes that his expert, Dr. Dudley, did consider his thoughts and behavior at the time of the crime in reaching his diagnosis. N.T. 9/10/01 at 116. With respect to the 1985 evaluations conducted by Dr. Saul and Dr. Joaquin, appellee notes that these assessments were not conducted as part of a mitigation or life history evaluation, but as competency evaluations. Regardless, appellee contends that these evaluations diagnosed him as having the same mental health impairments described by Dr. Dudley. Furthermore, concerning the Commonwealth's dysfunctional childhood arguments, appellee contends that trial counsel learned sufficient information from appellee—*e.g.,* he was a drug addict from Georgia, he had been in prison, he had psychological disturbances, and he had suffered a "hard life," *see* N.T. 9/12/01 at 29, 31–32, 37—that would have led effective counsel to investigate and obtain the available mitigation evidence presented by appellee at the PCRA hearing. Appellee also argues that even if effective counsel had learned nothing about appellee's back-

ground from him prior to trial, it was still counsel's duty to investigate and pursue mitigation evidence available in appellee's background. *See Malloy*, 856 A.2d at 788 ("Counsel's duty is to discover [mitigation] evidence through his own efforts, including pointed questioning of his client."). Finally, concerning appellee's sister, Dorothy Brown, appellee asserts that the Commonwealth ignores the actual evidence presented at the PCRA hearing and credited by the PCRA court, *i.e.*, that trial counsel asked Ms. Brown nothing about appellee's life history and never actually interviewed her. N.T. 9/11/01 at 38–40, 52–54.

 In evaluating claims that capital counsel was ineffective for failing to conduct a sufficient investigation into mitigation evidence and to present that evidence, it is settled that counsel has a general duty to conduct reasonable investigations or reach reasonable decisions that render particular investigations unnecessary. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066; *Malloy*, 856 A.2d at 784. Moreover, "our principal concern in deciding whether [counsel] exercised 'reasonable professional judgmen[t]' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [appellee's] background *was itself reasonable*." *Malloy*, 856 A.2d at 784 (quoting *Wiggins*, 539 U.S. at 522–23, 123 S.Ct. at 2536 (citing *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066)).

To determine whether trial counsel was ineffective, we begin with a review of the investigation that counsel performed and the mitigation evidence presented at the penalty hearing. *See Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 72 (2003), *cert. denied*, —— U.S. ——, 125 S.Ct. 2956, 162 L.Ed.2d 891 (2005). A review of the record, which includes counsel's testimony at the PCRA hearing, reveals that counsel conducted little investigation to prepare for the penalty phase. Counsel testified that, before the trial, he learned from appellee that appellee had suffered a "hard childhood," that he abused drugs and alcohol, that he previously had been incarcerated, that he was originally from Georgia, that he had a

sister residing in Philadelphia, and that his other family members lived in Georgia. N.T. 9/12/01 at 29–32, 37. Despite learning this information from appellee, counsel testified that he: did not recall taking a social history from appellee; did not speak to any of his family members residing in Georgia; spoke to his sister living in Philadelphia, but did not ask her any questions regarding appellee's childhood; did not obtain any of appellee's prison records; did not obtain any of appellee's prior mental health evaluations; did not obtain appellee's federal probation records; did not recall discussing with appellee the importance of a psychological evaluation and testing for capital sentencing purposes; and did not have appellee evaluated by a psychologist or any mental health expert. *Id.* at 30–34, 36–37.

Dorothy Brown, appellee's sister and the only family member who trial counsel did speak with prior to the penalty hearing, testified at the PCRA hearing that counsel briefly met with her at his office. During the meeting, according to Ms. Brown, counsel introduced himself and informed Ms. Brown that he was handling her brother's case, but he did not ask her any questions concerning appellee's childhood background or ask her if she was in contact with any other family members, and if she was, whether she possessed their contact information. N.T. 9/11/01 at 38–40, 48–49, 52–54. Counsel testified that he recalled meeting with Ms. Brown, but did not remember the content of their conversation. N.T. 9/12/01 at 33.

In addition to the fact that trial counsel conducted little investigation into mitigation evidence, the record makes clear that he introduced no testimonial evidence in mitigation at the penalty hearing, and conceded the two aggravating factors presented by the Commonwealth at the penalty hearing. Counsel did, however, argue from the trial record three record-based mitigating circumstances to the jury: (1) that appellee was under the influence of extreme mental or emotional disturbance because of his long history of drug abuse and significant drug intoxication at the time of the murder; (2) that appellee's capacity to appreciate the criminality of his

acts or conform his conduct to the requirements of law was substantially impaired because of his drug intoxication at the time of the murder; and (3) that appellee acted under extreme duress because of his severe drug dependency. N.T. 3/15/86 at 17–19.[14] The jury found none of the mitigators.

Had counsel engaged in a reasonable investigation, he most likely would have discovered significant mitigation evidence concerning appellee's background, character, and mental defects. Specifically, at the PCRA hearing, numerous family members, including appellee's brother, three of his sisters, his aunt, and one of his cousins, testified as to the following regarding appellee's childhood: he was raised in a two-room house in Macon, Georgia, where as many as twenty-three people lived; he had five siblings born from four different fathers; he was raised in a home with no running water and often no working electricity; all of the people living in the house took turns bathing with the same cold water; his mother was thirteen years old when she had her first child, and fifteen years old when she gave birth to appellee; his mother was an alcoholic and drank to the point of intoxication often while she was pregnant with appellee and while she was breast-feeding him; his mother abandoned her children for days and sometimes weeks at a time while she was on drinking binges; his mother worked as a prostitute and often plied her trade in plain view of her children; his grandmother, who also was an alcoholic and lived in the two-room home, made and sold illegal alcohol in the home in the children's presence; his mother, grandmother, and uncle physically abused appellee; he never knew or had a relationship with his father; he and his siblings often went hungry and most days only ate one meal; he and his brother were forced to steal food on days where there was no food in the home; appellee was never properly clothed and resorted to placing pieces of cardboard in his shoes to cover the holes in the soles; he did not receive help from his mother or grandmother with schoolwork, and was not encouraged to attend school; and following

14. The trial court charged the jury on these three mitigators, as well as all statutory mitigating circumstances.

his mother's death, his four younger sisters were placed in foster care because of neglect and abuse, but he and his brother remained with their grandmother. N.T. 9/10/01 at 177–182, 186–192, 201–202; N.T. 9/11/01 at 6–8, 28–29.

Additionally, numerous records were available at the time of trial that also would have provided support for a factual case in mitigation. For example, appellee's birth certificate indicated his mother was fifteen years old when she gave birth to appellee, and that he was her second child. PCRA Exhibit 15. In addition, a 1983 federal probation record included a summary of appellee's childhood, and provided:

> According to the defendant, and verified by a maternal aunt, the defendant's mother and grandmother regularly abused alcohol, and he had little home supervision. At age 16, Sneed left the grandmother's residence and "hit the street."

PCRA Exhibit 19. Furthermore, a Philadelphia presentence investigation report prepared several weeks before trial—in connection with a different murder charge in which trial counsel in the present case also represented appellee—referenced the 1983 federal probation report and noted:

> [Appellee is a] native of Macon, Georgia, [and] he is the only child born out of wedlock to Robery (sic) Conty and Eleanor Brown. He also has an older brother and four younger sisters born of his mother's relationships with several different men.... He was the product of what seemingly appears to be a disorganized household.... Along with being provided with inadequate supervision, the Subject's mother and his maternal aunt, with whom he later went to live, were regarded as excessive drinkers.... His father, a native of Macon, Georgia, had little or nothing to do with rearing or supporting him. He reportedly died in 1965 when the Subject was 14 years old.... His mother, also a native of Macon, Georgia, died in 1963 at age 29 from a virus, when the Subject was 12 years old.

PCRA Exhibit 18 at 1–2.

Moreover, the record and testimonial evidence presented at the PCRA hearing also suggested that, through diligent inves-

tigation, counsel could have uncovered possible mental health mitigation available at the time of trial. Dr. Dudley testified that the type of abuse, neglect, and family dysfunction experienced by appellee during his childhood has a severe impact on an individual.[15] Concerning these matters, Dr. Dudley testified as follows:

Q: In your own affidavit, Doctor Dudley, at Paragraph 5, you discuss trauma, dysfunction, and child deprivation that is clinically significant. Can you discuss those issues for us, and could you explain to us why those matters are clinically significant to a mental health mitigation assessment?

A: What I'm attempting to say is that we know that significant neglect, the absence of all the sorts of things that one would expect care givers to provide, whether it'[s] emotional support, developmental support, the basic needs for food, shelter, clothing, etc., academic support, guidance, we know that that sort of neglect results in developmental difficulties which tend to be long term and have a long term impact on the person. We also know that being exposed to violence, other sorts of traumas, physical abuse, also, has an effect on a person's development that can be very long term in effect. So, I highlight these as part of the history because we know the implications for child growth and development and adult functioning as well.

Q: What are those implications?

A: That unaddressed, you end up with adults with self[-]esteem issues. You end up with adults who are not trusting, who are suspicious, who are always thinking something will happen to them. You end up with adults who have difficulty trusting, forming reasonable attachments or bonds, and they tend to be more by themselves or isolated, or schizoid.

15. Dr. Dudley testified that prior to his psychiatric examination of appellee in May of 2000, he reviewed and relied upon life history information, *e.g.*, affidavits and statements from family members and friends of appellee; school records; records relating to probation, prior offenses, and incarceration; presentence investigation reports; previous mental health evaluations; this Court's opinion on direct appeal; and the penalty phase transcript. N.T. 9/10/01 at 14–16.

N.T. 9/10/01 at 46–47. Dr. Dudley also testified that the mental health effects of neglect, abuse, and dysfunctional upbringing were known to the mental health profession at the time of trial. *Id.* at 41–42.

Dr. Dudley further testified to his opinion that, as a result of his childhood upbringing, appellee suffered from an inability to develop trust in people, emotional liability, impulse control impairment, cognitive deficiencies, paranoid ideation, impaired self-esteem, depression, impaired view of self, and mixed personality disorder with paranoid, schizoid, and anti-social features. *Id.* at 51–57, 59–61. Dr. Dudley concluded with an opinion that, as a result of these mental impairments, appellee, at the time of the murder, was under the influence of extreme mental disturbances and extreme emotional disturbances, and that his capacity to conform his conduct to the requirements of law was substantially impaired. *Id.* at 85–87; *see* 42 Pa.C.S. § 9711(e)(2) & (3).

The facts of the instant case are very similar to the facts presented in *Malloy, supra.* In that case, trial counsel's preparation consisted of only meeting with his client twice prior to trial for one and one-half hours for the first visit and two and one-half hours for the second visit, including travel time. Counsel undertook little or no affirmative effort in preparing for the penalty phase as well, engaging in a paucity of investigation of mitigation. Counsel in fact admitted that he conducted virtually no preparation for the penalty phase. During the penalty hearing, counsel introduced no testimonial evidence, but did argue two record-based mitigating circumstances. This Court noted that, if counsel had conducted a reasonable investigation, he would have discovered that Malloy was abused during his childhood by his mother and her boyfriend, that he was placed with his grandmother after his mother abandoned him, and that he was institutionalized at the age of twelve because of his criminal behavior. On this record, this Court found that counsel was ineffective for not investigating and presenting a reasonable case in mitigation, noting that the foregone evidence was easily discoverable had counsel undertaken even a minimal investigation. *See Malloy,*

856 A.2d at 787. Because of the significant similarities between the instant case and *Malloy*, we believe that the issue of whether trial counsel was ineffective for failing to investigate and present evidence of appellee's dysfunctional childhood and resulting psychological effects is controlled by *Malloy*.

First, we have little difficulty in concluding that appellee has proven arguable merit. As we noted in *Malloy*, although the type of mitigation evidence presented by appellee on collateral review, *i.e.*, dysfunctional childhood and resulting mental health effects, may not be as strong as the "smoking gun" mitigation evidence at issue in some other cases,[16] appellee did prove that if counsel had conducted even a minimal investigation, he would have uncovered significant mitigation evidence in appellee's background that was easily discoverable. *See id.* Indeed, some of the available mitigation evidence was easily discoverable in appellee's prior incarceration records and the presentence investigation report for the other murder charge where counsel also represented appellee. In addition, counsel's performance at the penalty hearing was lacking as he produced no testimonial evidence, choosing rather to argue record-based mitigating circumstances found unpersuasive by the jury. Moreover, as recognized in *Malloy*, "[t]he onus is not upon a criminal defendant to identify what types of evidence may be relevant and require development and pursuit. Counsel's duty is to discover such evidence through his own efforts, including pointed questioning of his client." *Id.* at 788. Therefore, although it is true that appellee never volunteered to counsel all of the alarming details of his childhood, it was not necessarily his responsibility to do so. Counsel is charged with the duty of asking probing questions of his client, and with the duty of discovering and developing mitigation evidence in light of what options are afforded by the Sentencing Code. Here, counsel failed to undertake a reasonable investigation, including sufficiently questioning appellee

16. *See, e.g., Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (trial counsel found ineffective for failing to conduct investigation that would have uncovered extensive records graphically describing horrific childhood).

concerning any possible mitigation evidence, and he failed to adequately question the one potential mitigation witness he did meet with, appellee's sister. Accordingly, appellee's claim of trial counsel ineffectiveness has arguable merit.

Second, it is clear that counsel's failure to investigate and develop mitigation evidence of appellee's background was not an objectively reasonable strategy. It is well-settled that the reasonableness of counsel's investigation into possible mitigation evidence can depend upon the information provided by the defendant, and counsel cannot be deemed ineffective for not introducing information uniquely within the knowledge of the defendant and his family which is not supplied to counsel. *See Commonwealth v. Williams,* 577 Pa. 473, 846 A.2d 105, 113 (2004) (citing *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 45–46 (2002)). In this case, however, the testimony presented at the PCRA hearing established that counsel failed to conduct even a cursory investigation into appellee's background. This case, similar to *Malloy,* is not one where trial counsel attempted to question his client and family members with the goal of eliciting relevant mitigation information, only to have childhood abuse, severe family poverty, squalid childhood living conditions, parental alcoholism, mental health issues, or other potential mitigation evidence within their knowledge not revealed to counsel. *See Malloy,* 856 A.2d at 788; *contrast Bond,* 819 A.2d at 47 (noting that trial counsel met with client and family members on several occasions and they failed to reveal potential childhood mitigation). Therefore, counsel's inaction and failure to engage in any substantive investigation was not caused by appellee and his family's noncooperation in supplying mitigation evidence. "Although counsel cannot be ineffective for failing to investigate evidence which he had no reason to know existed, counsel still has an obligation to conduct a reasonable investigation to uncover such information." *Malloy,* 856 A.2d at 788.

Finally, to demonstrate prejudice, "[a] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Moreover, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins,* 539 U.S. at 534, 123 S.Ct. at 2542. Accordingly, as noted in *Malloy,* in determining whether appellee was prejudiced, we must consider not only the evidence and argument presented at the penalty hearing by trial counsel, but also the evidence and argument that would have been presented at the penalty hearing had counsel properly investigated such evidence. *See Malloy,* 856 A.2d at 789 (citing *Wiggins,* 539 U.S. at 536–37, 123 S.Ct. at 2543).

As previously noted, the Commonwealth presented two aggravating circumstances at the penalty hearing, namely that appellee had a significant history of violent felony convictions, and that appellee had a prior murder conviction. In assessing prejudice, these two aggravating factors must be contrasted with the three mitigating circumstances actually presented by counsel, as well as the mitigating circumstances that counsel should have investigated, namely appellee's abusive and dysfunctional childhood background and its residual mental health effects. Here, trial counsel presented no affirmative or testimonial evidence at the penalty hearing; instead, he forwarded only a brief argument and concession of the Commonwealth's aggravating factors. Similar to counsel in *Malloy,* in a point stressed by this Court in that case, counsel failed to make an effort to personalize appellee for the jury. Had counsel made such an effort, he may well have made one or more of the jurors more likely to accept one of the other mitigating circumstances that was presented. *See Malloy,* 856 A.2d at 789. We are satisfied that if the jury had heard testimony and argument regarding the mitigation evidence presented by appellee at the PCRA hearing, there is a reasonable probability that at least one juror would have struck a different balance and voted not to impose the death penalty. *See id.* (citing *Wiggins,* 539 U.S. at 536–37, 123 S.Ct. at 2543). Accordingly,

we agree with the court below that appellee was denied the effective assistance of counsel at the penalty phase.

Thus, for the foregoing reasons, we affirm the PCRA court's order to the extent that it granted appellee a new penalty hearing, but we vacate the PCRA court's order granting appellee a new trial. Jurisdiction relinquished.

Chief Justice CAPPY, Justice NEWMAN, Justice SAYLOR, Justice EAKIN and Justice BAER and Justice BALDWIN join the opinion.